[Civ. No. 38925. Second Dist., Div. Four. Apr. 14, 1972.]

CONTINENTAL BANK, Plaintiff and Appellant, v.
PHOENIX INSURANCE COMPANY, Defendant and Respondent.

## Counsel

Caidin, Kalman, Hartman & Sampson and Newton Kalman for Plaintiff and Appellant.

Robert E. Brimberry and James D. Vogt for Defendant and Respondent.

## Opinion

**DUNN, J.**—Plaintiff bank sued for money allegedly owing from defendant, based upon defendant's issuance of a surety bond to plaintiff. From a judgment for defendant after a nonjury trial, plaintiff appeals. Appellant contends the court's findings VIII and IX are unsupported by evidence and, additionally, that such findings are "erroneous as a matter of law."

We must view the evidence in a manner tending to sustain the judgment, resolving all conflicts in its favor and drawing from the evidence all favorable inferences reasonably deducible. (*Estate of Bristol* (1943) 23 Cal. 2d 221, 223-224 [143 P.2d 689]; *Hicks* v. *Reis* (1943) 21 Cal.2d 654, 660-661 [134 P.2d 788].) The record shows that Leon Chabot, Joseph Chabot and Fred Nestroyl were partners doing a custom picture framing business in Los Angeles as "Framecraft." Ben Wilks was employed by Framecraft as an artist. Sometime before September 27, 1963, the three partners created C.C.N. & W. Co., Inc., a corporation, to manufacture picture plaques; its place of business was in West Los Angeles. Although Framecraft continued in business, Ben Wilks started to work for C.C.N. & W. Co., as an artist. (The initials, of course, stand for Chabot, Chabot, Nestroyl and Wilks.) He received a salary of $150 per week. Although Wilks was given the title of vice-president, he was never a director or shareholder of the corporation.

In October 1963 the Chabot brothers, Leon and Joseph, sought to borrow money from plaintiff bank on behalf of the corporation. The bank customarily required the principals of a borrowing corporation to submit financial statements, also signing individual loan guaranties signed additionally by their wives. Since Framecraft was owned by the three partners, Continental was furnished a financial statement of that partnership, together with the personal statements of Nestroyl and both Chabots. Framecraft's statement showed a net worth of $117,451.34 as of December 31, 1962. The net worth of the others, as of July 1, 1963, was: Joseph Chabot—$103,350, Leon Chabot—$140,570 and Nestroyl—$44,900. A statement of Wilks also was furnished. It showed assets of $46,300 but did not show his net worth. Wilks' statement was further incomplete since it did not identify any

individual asset, such as real estate, stocks and bonds, although the other statements did. (Wilks testified the signature on it was not his.)

The bank was furnished a "Continuing Guaranty" (Civ. Code, § 2814) of any loans, to a total of $100,000, made by it to C.C.N. & W. Co. This purported to be signed by Nestroyl, the Chabots, Wilks and their wives. However, it was stipulated at the trial that Mrs. Wilks' signature was not hers but was a forgery.

Plaintiff bank first loaned money to C.C.N. & W. Co. on October 1, 1963; by December 26th the company owed the bank $51,000. C.C.N. & W. Co. encountered financial problems; its statement of income for the fiscal year ending May 31, 1964, showed a net loss of $117,104.20. Plaintiff bank had knowledge of this but, in accordance with its usual practice, "renewed the credit" of C.C.N. & W. Co. and continued to loan it money. It last renewed its credit on July 11, 1966. C.C.N. & W. Co., Inc., Nestroyl, Wilks and both Chabots thereafter were adjudged bankrupts. Mrs. Wilks did not participate and was not so adjudged, so that her separate assets would have been available to a judgment if she had been liable on the guaranty to the bank.

Defendant's surety policy, entitled "Bankers Blanket Bond," effective July 1, 1965, contained this language: "The Losses Covered By This Bond Are As Follows: . . . (E) Any loss through the Insured's having, in good faith and in the course of business, . . . *extended any credit* . . . *on the faith of, or otherwise acted upon any* . . . written instruments which prove to have been . . . forged as to the signature of any . . . surety or guarantor . . . ." We emphasize the underlined words above. In paragraph VIII of its findings the court stated: "The evidence clearly shows that the participation of Mr. and Mrs. Wilks in the credit negotiations and loan transactions . . . was so negligible as to be characterized de minimus and the evidence is further clear and convincing that plaintiff, Continental Bank, placed no reliance upon the Wilks or their credit. The evidence clearly manifests that the loans would have been made to C.C.N. & W. Company, Inc. whether the Wilks participated in the Continuing Guaranty or not, and that the forgery of Mrs. Wilks' signature was not a proximate cause of plaintiff, Continental Bank's loss."

■ In its briefs, appellant states the finding is "erroneous as a matter of law," a somewhat sophistic phrase. The true point, and the one argued, is that the finding leads to the erroneous legal conclusion that such finding constitutes a defense. Thus, it is argued that whether the bank relied upon the genuineness of Mrs. Wilks' signature, or whether any such reliance was a proximate cause of the bank's loss, is of no significance. This argument

seemingly is founded upon the contention that the bond's language cannot lend itself to such a finding.

Clause (E) of the bond contains language in standard and regular use among insurers in this field. (See: Fields, *Bankers Blanket Bonds: What They Cover and What They Do Not,* 27 Ins. Counsel J. 318; Posey, *Recent Trends in Clause (E) Cases—Bankers Blanket Bonds,* 33 Ins. Counsel J. 87.) However, no article or reported case, called upon to interpret the language on this particular point, has been brought to our attention. Both sides cite *Jones* v. *Fireman's Fund Ins. Co.* (1969) 270 Cal.App. 2d 779 [76 Cal.Rptr. 97, 38 A.L.R.3d 1430] but it is not determinative. In that case, clause (E) of a Bankers Blanket Bond was involved and a judgment for the defendant was reversed. Without discussing the materiality of the contention, the court observed (p. 784): "The insurer contends that the issue of whether or not the forgery was a proximate cause of the loss requires additional testimony. . . . In view of this record, we feel that the facts of reliance and proximate cause have been established beyond possible contradiction or dispute." Other authorities cited by both sides are equally nondeterminative. Accordingly, we approach this facet of the interpretation as being a new matter, previously undecided.

First, to be covered by the bond any outlay of funds or credit extension by the bank must have been granted in reliance upon a writing bearing a forged signature. By way of example, suppose the prospective borrower of a small sum of money presented a bank with an instrument supporting the desired loan. The bank knew the instrument was spurious but nevertheless loaned money to him, because it was acquainted with him and believed his net worth was vast. If the bank sustained a loss because it had been mistaken, it could not successfully contend that its loss was caused by reliance upon the spurious document. This thought is carried into the language of clause (E). It speaks of a loss incurred through extending credit "on the faith of" a written instrument with a forged signature.

Second, although appellant argues that the language is ambiguous and, therefore, that it should be construed against the defendant insurer, we conclude it to be unambiguous; the parties' intention is clear. Furthermore, assuming the bond represents a contract of adhesion, the bank could not establish objectively a contrary "reasonable expectation." (See: R. Keeton, Basic Text on Insurance Law, p. 350.) According to the dictionary, "faith" means complete confidence, belief or trust. We are bound to recognize "The true signification of all English words and phrases . . . ." (Evid. Code, § 451, subd. (e).) The phrase, "on the faith of," clearly signifies something done "in reliance upon."

The trial court found the bank "placed no reliance upon the Wilks or their credit," also finding "the forgery of Mrs. Wilks' signature was not a proximate cause" of the bank's loss. It is unnecessary to analyze or discuss the finding of "proximate cause" because the judgment against the plaintiff is supported by the finding that the bank "placed no reliance upon" Mrs. Wilks' credit. Thus, we deal here with the language of the writing by which defendant agreed to bind itself. For that reason, a discussion of the legal concept, proximate cause, would be merely a rhetorical exercise.

■ We further conclude the trial court's finding is supported by the evidence. It establishes that plaintiff bank relied upon the credit and guaranties of the Chabots and Nestroyls to the exclusion of Mr. and Mrs. Wilks. Indeed, the bank had no information concerning the worth of Mrs. Wilks. While a bank officer testified that it was a "practice and principle" to obtain financial statements and guaranties of all principals and their wives, he also testified that "the primary consideration of the *net* worth of the guarantors controls the loan," adding that it is merely good banking practice to get the guaranties, on a theory that it doesn't cost any more and "you get as much as you can."

The conclusion we have reached regarding finding VIII makes it unnecessary to consider appellant's additional contentions regarding finding IX and its related conclusion of law which specifically was based upon *Sumitomo Bank of Cal.* v. *Iwasaki* (1968) 70 Cal.2d 81 [73 Cal.Rptr. 564, 447 P.2d 956].

The judgment is affirmed.

Files, P. J., and Jefferson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 22, 1972.