[Civ. No. 58620. Second Dist., Div. Three. Dec. 21, 1981.]

HUGH A. HALFORD, Plaintiff and Appellant, v.
DORIS V. ALEXIS, as Director, etc., Defendant and Respondent.

---

---

## COUNSEL

Martin H. Kodish and Arthur E. Schwimmer for Plaintiff and Appellant.

George Deukmejian, Attorney General, and Philip C. Griffin, Deputy Attorney General, for Defendant and Respondent.

---

## OPINION

**KLEIN, P. J.**—This case presents the issue of whether the statutory process by which California converted from a calendar-year vehicle license renewal system to a staggered, year-round system, effective as of the 1976 registration year, violates the equal protection clauses of the United States and California Constitutions.

For the reasons discussed, we conclude that the implementation of the year-round registration plan comports with constitutional guarantees.

## BACKGROUND

Appellant Hugh A. Halford (Halford) was the owner of a motor vehicle registered in California during the 1976-1977 registration year with a registration renewal period between July 1976 and July 1977, excluding January 1977.

Halford proceeded with a class action on behalf of himself and all others similarly situated against respondent, the Director of the Department of Motor Vehicles of the State of California (DMV), challenging the constitutionality of the legislative scheme and seeking a refund of excessive vehicle license fees paid.

Halford gives credence to the Legislature's right to redress the calendar year system of renewal which admittedly caused "terrible workload problems for the DMV each year," but proclaims that feasibility study alternative 11 should have been implemented rather than the one adopted as this alternative affords adequate constitutional protections.

By way of a stipulation between the parties, the damage and class issues were bifurcated from the issue of liability, which latter issue is the only one presently before this court.

## FACTS[1]

1. *Background of the Year-round Registration Plan and Its Implementation*

In 1970 the DMV began an in-depth study to determine the best method of converting from vehicle registration based on the calendar year where the registration deadline for all vehicles occurred on the same date to a staggered, month to month, year-round registration system. The basic reasons for the interest in changing the existing system was to better accommodate the state's vehicle owners and to equalize the registration renewal workload. As a result of the initial study, a pilot program for the year-round registration of motorcycles was instituted in 1971.

A "Feasibility Study" concerning year-round vehicle registration was developed by the DMV in 1972 in response to an Assembly resolution

---

[1]The facts surrounding this proceeding are essentially uncontroverted.

calling for such a study. The 97-page study set forth the following objectives for the year-round registration system: "(a) Provide improved, more timely and convenient year-round service to the public; [¶] (b) Distribute evenly the [DMV's] renewal workload over the work days of each month within the year; [¶] (c) Enable prompt updating of the [DMV's] automated data processing system and the manual document file in order to provide current information; [¶] (d) Accommodate new programs associated with registration; [¶] (e) Not reduce the total amount of revenue produced by the present system."

The study proposed 19 alternatives for implementation of a year-round registration system. Alternative 1 was recommended to the Legislature based upon the following considerations determined to be of primary importance: "(1) Provides the most equitable fee assessment method and minimizes, as much as possible, the inconvenience to the public; [¶] (b) Does not adversely affect the over-all fiscal impact on the cities and counties and on the [DMV]; [¶] (c) Can be implemented readily and efficiently with a minimum of error; [¶] (d) It could be implemented within one year's time thereby achieving the objective of leveling the registration renewal workload, at a minimum of expense and inconvenience."

Alternative 1, denominated the "Date Plan," was adopted by the Legislature, becoming effective in the 1976 registration year. Under alternative 1, previously registered vehicles were assigned new registration expiration dates based upon their license plate letters and numbers. Pursuant thereto, owners registered and paid as usual on January 1, 1976, and in accordance with the date plan, were assigned a month and a specific day within said month on which date their registration fees became due. If their assigned dates were not in excess of 12 months, these owners thereby were required to pay twice in 1976, and their registration fees again were due on their assigned dates in 1977 and regularly thereafter.

This assignment of expiration dates created conversion registration "years" ranging from seven to eighteen months, resulting in the expiration of one-twelfth of the total registrations each month.

## 2. The Vehicle License Fee (VLF) Under Alternatives 1 and 11.

The annual amount of the VLF is 2 percent of the vehicle's market value[2] determined by the DMV from the manufacturer's suggested retail price of the vehicle when first sold.[3] Vehicles are placed in classifications according to their market value[4] which decreases, along with the fee to be paid, every year until a fixed rate is reached in the vehicle's ninth year.[5]

Under alternative 1 conversion registration "years" ranged from seven to eighteen months, and VLF for the conversion periods were prorated on the basis of the number of months assigned.[6] Vehicles with conversion periods from 7 to 12 months (expiration dates from July 1976 to Dec. 1976) registered twice in 1976 while those with conversion periods from 13 to 18 months (expiration dates from Jan. 1977 to June

---

[2]Revenue and Taxation Code section 10752 provides: "The annual amount of the license fee for any vehicle other than a trailer coach which is required to be moved under permit as authorized in Section 35790 of the Vehicle Code shall be a sum equal to 2 percent of the market value of the vehicle as determined by the department."

[3]Revenue and Taxation Code section 10753 provides in pertinent part: "(a) For the purposes of this part, the market value of passenger vehicles, ... shall be determined by the department upon the basis of the California suggested base price as herein defined and as established by the manufacturers. [¶] ... [¶] (h) As used in this section, 'suggested base price' means the retail price of the vehicle suggested by the manufacturer, ..."

[4]Revenue and Taxation Code section 10753.2, subdivision (b) provides: "For the purpose of this part, a classification plan is established consisting of the following classes: a class from no dollars ($0) to and including forty-nine dollars and ninety-nine cents ($49.99); a class from fifty dollars ($50) to and including one hundred ninety-nine dollars and ninety-nine cents ($199.99); and thereafter a series of classes successively set up in brackets having a spread of two hundred dollars ($200), consisting of such number of classes as will permit classification of all vehicles."

[5]Revenue and Taxation Code section 10753.2, subdivision (c) provides in pertinent part: "The market value of a vehicle for each registration year, starting with either the year the vehicle was first sold to a consumer as a new vehicle or the year the vehicle was first purchased or assembled by the person applying for original registration in this state, shall be as follows: for the first year, 85 percent of a sum equal to the middle point between the extremes of its class as established in subdivision (b) of this section; for the second year, 70 percent of such sum; for the third year, 55 percent of such sum; ... for the sixth year, 25 percent of such sum; for the seventh year, 15 percent of such sum; for the eighth year, 10 percent of such sum; and for the ninth and each succeeding year, 5 percent of such sum; provided, however, that the minimum tax shall be the sum of one dollar ($1)."

[6]Revenue and Taxation Code section 10755 provides: "Whenever, by reason of the assignment of an expiration date by the Director of Motor Vehicles, the registration year for the vehicle is less than, or more than, 12 months, the fee for the vehicle shall be decreased or increased by one-twelfth of the annual fee for each month of such period less than, or in excess of, 12 months."

1977) registered only once. 1976 VLF rates were assigned to all registrations which took place in 1976, regardless of whether their terms extended into 1977. Registrations taking place in 1977 were assigned 1977 VLF rates, in 1978 they were assigned 1978 rates, etc.[7]

Thus, vehicles in the same classifications which otherwise would have had identical VLF rates had different rates based upon the registration year designated by their license plates. *Over the nine-year depreciation period*, owners of vehicles with registration dates commencing in 1977 paid from *about $50 to $100 more* in VLF than did their counterparts whose vehicle registration year commenced in 1976 and extended into 1977, thereby affording them the lower 1977 VLF rates.

Alternative 11 was virtually identical to alternative 1 except that rather than the 10 percent reduction, it provided for the proration of VLF rates. Under that plan, 1976 VLF rates would be used for the portion of the registration year occurring in the 1976 calendar year and 1977 VLF rates for that portion occurring in the 1977 calendar year.

Alternative 11 had the disadvantage of requiring DMV window clerks to use either a separate chart for each calendar year and compute the VLF manually or a precomputed chart covering the applicable period in each of the two calendar years. While implementation of alternative 1 took place within one year, as use of a conversion chart was necessary only for the initial registration year, the use of such charts under alternative 11 would have continued for nine years or until the vehicle reached its minimum market value at the end of its ninth year. Increased computer costs due to the double computation necessary to determine VLF under alternative 11 were also possible.

Thus, consideration of alternative 11's plan for the proration of VLF involved increased administrative costs and afforded greater probability of clerical error.

---

[7]Alternative 1 also provided for a one-time 10 percent reduction in the vehicle registration fee in 1976 to compensate vehicle owners for the inconvenience of paying for more than twelve months of registration at one time or renewing twice within the 1976 calendar year. In adopting the year-round registration system, the Legislature made the 10 percent reduction, which amounted to approximately $50 million, *permissive*. (Veh. Code, § 9559.5; Rev. & Tax. Code, § 10851.) As a result, the reduction never took place and these funds were diverted to the state highway fund. Halford properly acknowledges that the elimination of the 10 percent reduction does not affect his equal protection argument.

Alternative 1 also had a greater potential for increased revenues than did alternative 11. Although alternative 1 contained a one-time 10 percent reduction in registration fees, the reduction as enacted by the Legislature was permissive, allowing the DMV flexibility in disbursement of the funds should they be needed elsewhere—an eventuality which in fact occurred. The comparative reduction in revenues created by the proration of the VLF was a necessary component of alternative 11.

## CONTENTION

It is the failure of the year-round registration plan to prorate VLF rates which Halford contends constitutes a denial of equal protection to those vehicle owners whose registration year commenced in 1976 and extended into 1977.

## DISCUSSION

Under the rational basis test as applied in *Carmichael* v. *Southern Coal Co.* (1937) 301 U.S. 495, 509-510 [81 L.Ed. 1245, 1252-1254, 57 S.Ct. 868, 109 A.L.R. 1327], parties attacking a statutory classification have the burden of showing that the challenged classification does not rest on any rational basis, but is essentially arbitrary. (See also *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 16-17 [112 Cal.Rptr. 786, 520 P.2d 10]; *Honeywell, Inc.* v. *State Bd. of Equalization* (1975) 48 Cal.App.3d 897, 904 [122 Cal.Rptr. 237]; *L.A.J., Inc.* v. *State Bd. of Equalization* (1974) 38 Cal.App.3d 549, 553 [113 Cal.Rptr. 319], disapproved on other grounds in *Culligan Water Conditioning* v. *State Bd. of Equalization* (1976) 17 Cal.3d 86, 93, fn. 4 [130 Cal.Rptr. 321, 550 P.2d 593].) Halford has failed to meet this admittedly heavy burden. No invidious discrimination has been shown.

"The general principles applicable to the determination of an equal protection challenge to state tax legislation were recently summarized by the United States Supreme Court as follows: 'We have long held that "[w]here taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation." [Citation.] A state tax law is not

arbitrary although it "discriminate[s] in favor of a certain class ... if the discrimination is founded upon a reasonable distinction, or difference in state policy," not in conflict with the Federal Constitution. [Citation.] This principle has weathered nearly a century of Supreme Court adjudication ....' (*Kahn v. Shevin* (1974) 416 U.S. 351, 355-356 [40 L.Ed.2d 189, 193, 94 S.Ct. 1734].) [¶] Consistent with the foregoing expression of broad liberality, the high court has recognized the wide flexibility permitted states in the enforcement and interpretation of their tax laws, holding that 'The latitude of discretion is notably wide in the classification of property for purposes of taxation and the granting of partial or total exemptions upon grounds of policy.' [Citations.] There exists no 'iron rule of equality, prohibiting the flexibility and variety that are appropriate' to reasonable schemes of taxation. [Citations.] So long as a system of taxation is supported by a rational basis, and is not palpably arbitrary, it will be upheld despite the absence of "'a precise, scientific uniformity'" of taxation. [Citations.]" (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 233-234 [149 Cal.Rptr. 239, 583 P.2d 1281].)

In an effort to ascertain a standard by which a rational basis can be determined to support a system of taxation, we look to the recent United States Supreme Court decision in *Western & Southern L. I. Co.* v. *Bd. of Equalization* (1981) 451 U.S. 648 [68 L.Ed.2d 514, 101 S.Ct. 2071].

That case involved a challenge to California's "retaliatory tax" on equal protection grounds, among others. In addition to imposing a premiums tax on both foreign and domestic insurance companies doing business within the state, California imposes a "retaliatory tax" on such a foreign insurance company when said insurer's state of incorporation imposes higher taxes on California insurers doing business in that state than California would otherwise impose on that state's insurers doing business in California.

In evaluating California's retaliatory tax system, the Supreme Court laid down the following test: "In determining whether a challenged classification is rationally related to achievement of a legitimate state purpose, we must answer two questions: (1) Does the challenged legislation have a legitimate purpose?, and (2) Was it reasonable for the

lawmakers to believe that use of the challenged classification would promote that purpose? See *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U.S. 456, 461-463 (1981); *Vance* v. *Bradley,* 440 U.S. 93, 97-98 (1979)." (*Id.,* at p. 668 [68 L.Ed.2d 514 at pp. 530-531].)

The Supreme Court upheld the admittedly more onerous tax on foreign insurers finding that Califoria's discrimination between foreign and domestic corporations bears a rational relation to a legitimate state purpose.

The court went on to observe that even though "[m]any may doubt the wisdom of California's retaliatory tax, . . . the courts are not empowered to second-guess the wisdom of state policies. *Ferguson* v. *Skrupa,* 372 U.S. 726, 729 (1963). [The court's] review is confined to the *legitimacy* of the purpose." (*Id.,* at p. 670 [68 L.Ed.2d at p. 532].)

In the case before us, certainly no one contests the legitimacy of the purpose of the classification under scrutiny. Halford contends, however, that the actual composition of the classes created by the Legislature bears no relationship to the object of the statutory scheme. *Western & Southern L. I. Co.* v. *Bd. of Equalization, supra,* 451 U.S. 648, seems to stand for the proposition that in determining whether a *tax statute* complies with the equal protection clause, we need only determine whether the challenged classification is rationally related to achievement of a legitimate state purpose, not that there must be some rational distinction between the members of a class.

It must be remembered that we are dealing with a *tax statute,* and the courts have held that "'. . . the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation.'" (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at pp. 233-234.)

This case evolves to whether the discrimination resulting from DMV's statutory scheme is *invidious.* Invidious has been defined as "[t]ending to excite odium, ill will, or envy; likely to give offense; esp., unjustly discriminating." (Webster's Collegiate Dict. (2d ed. 1960)

p. 443.) Invidious is also synonymous with "hateful, obnoxious, injurious, [and] odious." (Webster's New Internat. Dict. (3d ed. 1963) p. 1190.) Invidious discrimination is "'only "deliberate" (i.e., "purposeful or intentional") [discrimination] based upon an *"unjustifiable"* (i.e., *"invidious"*) *standard* which is proscribed by the equal protection clause.'" (Italics in original; *Bortin* v. *Superior Court* (1976) 64 Cal. App.3d 873, 877 [135 Cal.Rptr. 30], quoting *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286, 300 [124 Cal.Rptr. 204, 540 P.2d 44].) Invidious discrimination has also been "defined as a classification which is arbitrary, irrational and not reasonably related to a legitimate purpose" (fn. omitted; *United States* ex rel. *Buonoraba* v. *Commissioner of Cor.* (S.D.N.Y. 1970) 316 F.Supp. 556, 564) and as discrimination made against groups or types of individuals in violation of the constitutional guaranty of just and equal laws. (*Skinner* v. *Oklahoma* (1942) 316 U.S. 535, 541 [86 L.Ed. 1655, 1660, 62 S.Ct. 1110].)

In that regard, the case before us is distinguishable from *Haman* v. *County of Humboldt* (1972) 8 Cal.3d 922 [106 Cal.Rptr. 617, 506 P.2d 993], heavily relied on by Halford. In a case involving property tax on fishing boats owned by California residents but registered in ports in Oregon, Washington and Alaska for the tax year in question, the California Supreme Court at pages 925-927 recognized that "[d]istinctions can be *justified on the basis of administrative convenience and promotion of legitimate state interests.* [Citation.] . . . It is also clear that administrative difficulties can justify different treatment under a tax statute." However, the court went on to conclude that legislation requiring the plaintiffs therein to pay 24 times the tax paid by other California residents and amounting to a difference of $4,981.57 per year could not be justified on the basis of administrative convenience.

Contrary to the obnoxious and injurious discrimination between classes of tax payers in *Haman*, the difference in rates in the case before this court under alternative 1 ranged from only $50 to $100 over a nine-year period (about $5 to $11 per year). The total differential amount of the VLF could have been as negligible as $5 for a vehicle with a depreciation rate which was about to become fixed.

In the fact situation before us, we are not concerned with opprobrious discrimination based on sex, race, religion, national origin, physical prowess, or social or economic status, which discrimination is immediately suspect and may be subject to the strictest of scrutiny by the courts. (See *Hays* v. *Wood* (1979) 25 Cal.3d 772 [160 Cal.Rptr. 102,

603 P.2d 19] (profession); *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458 [156 Cal.Rptr. 14, 595 P.2d 592] (homosexuality; *Arp* v. *Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 395 [138 Cal.Rptr. 293, 563 P.2d 849]; *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.2d 351] (sex); *Bakke* v. *Regents of University of California* (1976) 18 Cal.3d 34 [132 Cal.Rptr. 680, 553 P.2d 1152], affd. in part and revd. in part *University of California Regents* v. *Bakke* (1978) 438 U.S. 265 [57 L.Ed.2d 750, 98 S.Ct. 2733]; *Castro* v. *State of California* (1970) 2 Cal.3d 223 [85 Cal.Rptr. 20, 466 P.2d 244] (race); *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241] later app. in *Serrano* v. *Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929], cert. den. *Clowes* v. *Serrano* (1977) 432 U.S. 907 [53 L.Ed.2d 1079, 97 S.Ct. 2951] (wealth); see also *Reed* v. *Reed* (1971) 404 U.S. 71 [30 L.Ed.2d 225, 92 S.Ct. 251] (sex).)

■ Here it was reasonable for state law makers to believe that use of the relatively innocuous classification would promote the changeover in the system of collecting VLFs. We do not find the evidence against DMV's implementation of alternative 1 overwhelming. The statutory scheme certainly is not invidious in its discrimination. In fact, it is questionable whether Halford's complaint against the system even rises to the level where the courts should interfere. The maxim "de minimis non curiat lex" seems to control here. (See *Zumbrun* v. *University of Southern California* (1972) 25 Cal.App.3d 1, 11 [101 Cal.Rptr. 499, 51 A.L.R.3d 991]; *Continental Bank* v. *Phoenix Ins. Co.* (1972) 24 Cal.App.3d 909, 912 [101 Cal.Rptr. 392].)

We agree with the observations of the trial court to the effect that "[t]hese inequities were not arbitrary or unreasonable when considered as part of the total year-round registration plan and its objectives . . . which benefited the entire California motoring public."

The judgment is affirmed.

Potter, J., and Lui, J., concurred.

A petition for a rehearing was denied January 20, 1982, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied February 24, 1982.