795 F.2d 827
 MITSUI MANUFACTURERS BANK, Plaintiff-Appellant,
v.
FEDERAL INSURANCE COMPANY, a corporation; Hartford Accident
& Indemnity Company, a corporation; Insurance
Company of North America, a corporation,
Defendants-Appellees.
 No. 85-6083.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 10, 1986.
Decided July 28, 1986.
 
 John A. Schwimmer, Alschuler, Grossman & Pines, Los Angeles, Cal., for plaintiff-appellant.
 William I. Chertok, Phillips, Nizer, Benjamin, Krim & Ballon, Los Angeles, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before HUG and FLETCHER, Circuit Judges, and GEORGE,* District Judge.
 HUG, Circuit Judge:
 
 
 1
 This case involves the interpretation of a banker's blanket bond ("bond"). Mitsui Manufacturer's Bank ("Mitsui") suffered losses from deposits that were credited to a customer's account, but were not collected because the endorsements on the deposited checks were forged. The central question is whether a clause of the bond excluded such losses from coverage. The district court entered summary judgment for the appellee bonding companies, and Mitsui appeals.
 
 I.
 
 2
 In February, 1980, appellant Mitsui obtained a bond from Federal Insurance Company, in which Hartford Accident & Indemnity Company and Insurance Company of North America assumed a proportionate responsibility for payment as co-underwriters. We shall refer to these insurance carriers as "the bonding companies." On November 20 and 21, 1980, Fran Impey Management Systems ("Fran Impey") deposited six checks drawn by Thomas, Halliburton & Weissman into its account with Mitsui. The checks totalled $297,266 and were made payable to third parties, who had allegedly endorsed the checks. Between November, 1980 and March, 1981, Mitsui submitted the checks for payment through the bank collection system four times; each time they were returned by the payor bank, the National Bank of Commerce ("NBC"), marked "insufficient funds," "uncollected funds," "payment stopped," and "payment stopped," respectively. On February 6, 1981, NBC also sent Mitsui a telex stating that "[i]rregularities in endorsement and other reasons under rules and regulations prevent us from honoring item." The "irregularities" referred to by NBC were the endorsements of the third-party payees which had been forged. Because Mitsui had credited the checks to Fran Impey's account on the day of deposit and had allowed it to draw against the checks before they cleared, Mitsui suffered a total loss on the checks.
 
 
 3
 Mitsui filed a claim for the loss under the bond with the bonding companies. They refused the claim on the ground that the loss was excluded from coverage by virtue of an exclusion provision in the bond. Mitsui then filed suit against the bonding companies in California Superior Court, alleging, inter alia, that the bonding companies had breached the insurance contract by failing to honor the claim. The suit was removed to federal district court and, thereafter, the court granted the bonding companies summary judgment on the ground that the loss was excluded from coverage by the terms of the bond.
 
 
 4
 The issue in this case is the interpretation to be given to the exclusion provision of the bond. The bonding companies maintain that the loss Mitsui suffered was caused by Mitsui's permitting the depositor to withdraw funds from its account based on credits that later proved to be uncollectible and that this type of loss was specifically excluded from the coverage of the bond. Mitsui maintains that the exclusion provision does not apply to this loss for several reasons: (1) the entire exclusion provision was intended to apply only to check-kiting schemes; (2) the loss was not proximately caused by the circumstances excluded from coverage of the bond; and (3) the exclusion did not apply because of an "on premises" exception to the exclusionary clause.
 
 
 5
 The exclusion provision of the bond upon which the denial of coverage is based states in pertinent part:
 
 This bond does not cover:
 
 6
 loss resulting from payments made or withdrawals from any depositor's account by reason of uncollected items of deposit having been credited by the Assured to such account, whether or not such items are forged or altered in any respect, notwithstanding the provisions of Insuring Clause 4 or sub-section (e) of Section 1. EXCLUSIONS, unless such payments are made to, or withdrawn by, such depositor or representative of such depositor who is within the office of the Assured at the time of such payment or withdrawal, or unless such loss is covered under Insuring Clause 1.[1]
 
 II.
 
 7
 In reviewing a grant of summary judgment, this court's task is identical to that of the trial court. While viewing the evidence in the light most favorable to Mitsui, this court must determine whether the bonding companies have shown that there are no disputed issues of material fact and that they are entitled to judgment as a matter of law. Foster v. Arcata Associates, Inc., 772 F.2d 1453, 1459 (9th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986); Alaska v. United States, 754 F.2d 851, 853 (9th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 333, 88 L.Ed.2d 317 (1985). In this case, the parties have stipulated that there are no disputed issues of material fact. Therefore, we will review de novo the questions of law raised by Mitsui's appeal. This is a diversity case, and the parties agree that we apply California law to the issues in this case. We review the district court's application of California law de novo. Matter of McLinn, 739 F.2d 1395, 1397-98 (9th Cir.1984) (en banc).
 
 
 8
 Under California law, the insurer has the burden of proving that an exclusion applies. Clemmer v. Hartford Insurance Co., 22 Cal.3d 865, 880, 587 P.2d 1098, 1105-06, 151 Cal.Rptr. 285, 292 (1978). Any ambiguity in the contract language is construed against the insurer. See e.g., Century Bank v. St. Paul Fire & Marine Insurance Co., 4 Cal.3d 319, 321, 482 P.2d 193, 194, 93 Cal.Rptr. 569, 570 (1971); Continental Bank v. Phoenix Insurance Co., 24 Cal.App.3d 909, 913, 101 Cal.Rptr. 392, 394 (1972); Jones v. Fireman's Fund Insurance Co., 270 Cal.App.2d 779, 76 Cal.Rptr. 97, 100 (1969). In construing the contract, the court looks to the reasonable expectations of the insured. Century Bank, 4 Cal.3d at 321, 482 P.2d at 194, 93 Cal.Rptr. at 570; see also State Farm Mutual Automobile Insurance Co. v. Jacober, 10 Cal.3d 193, 202-03, 514 P.2d 953, 958-59, 110 Cal.Rptr. 1, 6-7 (1973).
 
 
 9
 However, "[a] claim of ambiguity cannot be based on a strained interpretation of the terms of a policy." Connick v. Teachers Insurance and Annuity Ass'n of America, 784 F.2d 1018, 1020 (9th Cir.1986) (citation omitted). Further, "[a] court [should not] search for an ambiguity when the meaning of the policy is clear." Tenopir v. State Farm Mutual Co., 403 F.2d 533, 535-36 (9th Cir.1968); see also Continental Bank, 24 Cal.App.3d at 913, 101 Cal.Rptr. at 394.
 
 III.
 
 10
 Mitsui first contends that the exclusion provision was intended to apply only to uncollected deposits resulting from a check-kiting scheme; since these deposits were uncollectible because of forged endorsements, not a check-kiting scheme, the exclusion provision does not apply. Mitsui's contention that the exclusion provision applies only to check-kiting schemes finds no support in the language of the provision itself. The basis for the contention is that a predecessor to this provision was interpreted by several courts to apply only to check-kiting schemes and not to losses resulting from deposits that were uncollectible for other reasons.[2] See First National Bank of Miami v. Insurance Co. of North America, 495 F.2d 519, 522 (5th Cir.1974) (per curiam) (forgery); Clarendon Bank & Trust v. Fidelity and Deposit Co. of Maryland, 406 F.Supp. 1161, 1171 (E.D.Va.1975) (withdrawal of funds attributable to dishonored checks); Aetna Casualty and Surety Co. v. Louisiana National Bank, 399 F.Supp. 54, 56 (M.D.La.1975) (withdrawal of funds credited by mistake).
 
 
 11
 Those decisions base their interpretations of the exclusionary clause before them on reasoning analagous to reliance on legislative history in interpreting a statute. All three courts discuss and rely upon a report issued by the Surety Association of America, one of the drafters of the provision before the three courts. That report had labeled the provision the "check-kiting" exclusion.
 
 
 12
 Whatever the soundness of those courts' reasoning in varying the plain language of the provision because of the label on that report, the reasons for that construction have now been dispelled by later actions of the Surety Association of America in response to those decisions. In 1976, the Surety Association appointed a subcommittee to study the situation and make recommendations for revising the exclusion language. In its 1976 Report, the subcommittee stated that "the exclusion may have been directed to a check kiting situation, but ... it was not intended to apply exclusively to that situation." The subcommittee recommended that the exclusion be renamed the "Uncollected Funds Exclusion" and also recommended that the bond be revised to include language similar to the italicized phrase quoted above.
 
 
 13
 The plain language of the provision itself is unambiguous. It excludes from coverage a "loss resulting from payments made or withdrawals from any depositor's account by reason of uncollected items of deposit having been credited by the Assured to such account, whether or not such items are forged or altered in any respect...." The deposits in this case were uncollected because the endorsements were forged. The plain language of the exclusion is clearly applicable to this loss. There is nothing in the provision that even hints that it is applicable only to check-kiting schemes. Any contrary conclusion that could be drawn from the prior action of the Surety Association of America is negated by the subsequent action of the Association in 1976, which was several years before the issuance of this bond in 1980. A recent, carefully reasoned district court decision reached the conclusion that the terms of a similar exclusion provision were unambiguous and not limited to check-kiting schemes. See Bay Area Bank, 629 F.Supp. at 696-97.
 
 IV.
 
 14
 Mitsui's second argument relates to causation. Mitsui contends that its loss was not caused by its crediting the checks to Fran Impey's account and allowing withdrawals against those funds, but rather by NBC's ultimate refusal to pay the checks. Thus, Mitsui argues, while the bonding companies may have shown "but for" causation, they have not demonstrated the proximate cause required by California law. If the exclusion were to be construed in this strained fashion, it would completely negate the provision. The "cause" could always be attributed to whatever circumstances made the deposit uncollectible.
 
 
 15
 Moreover, as the bonding companies point out, California courts have often defined proximate cause as " 'the efficient cause--the one which sets others in motion....' " Sabella v. Wisler, 59 Cal.2d 21, 31-32, 377 P.2d 889, 895, 27 Cal.Rptr. 689, 695 (1963) (quoting 6 Couch, Insurance Sec. 1463 p. 5298 (1930)); see also Farmers Insurance Exchange v. Adams, 170 Cal.App.3d 712, 216 Cal.Rptr. 287, 294 (1985) (finding coverage by insurer if included risk is efficient or concurrent proximate cause of harm), hearing denied (October 16, 1985). Here, Mitsui, by crediting the checks to Fran Impey's account and allowing subsequent withdrawal of these funds, certainly set in motion the chain of events which resulted in the loss incurred by NBC's later refusal to pay the checks. Thus, we find that Mitsui's acts proximately caused its loss and that the loss falls squarely within the language of the exclusion.
 
 V.
 
 16
 Finally, Mitsui argues that even if the bond would not ordinarily cover losses due to uncollected items of deposit, it is entitled to payment because the "on premises" exception to the exclusion applies to the facts in this case. The "on premises" exception provides bond coverage to an otherwise excluded loss if withdrawals or payments are made to a depositor who is actually in the bank at the time the deposit and withdrawals or payments are made.
 
 
 17
 In this case, Fran Impey withdrew the funds attributable to the forged checks by later writing checks against them; its representatives were not at Mitsui when it did so. However, Mitsui argues that because its operations officer initialed the deposit slip and allowed immediate credit against the checks, a constructive "payment" or "withdrawal" actually occurred, thus meeting the "on premises" exception. The bonding companies contend that Mitsui's action did not irrevocably commit it to pay the funds; hence no constructive "withdrawal" or "payment" occurred while Fran Impey's representatives were at Mitsui.
 
 
 18
 Mitsui relies on Clarendon Bank & Trust, 406 F.Supp. at 1172, where the court held that sight-posting of deposits by a bank vice president constituted "withdrawal" or "payment" for purposes of the "on premises" exception. However, in Clarendon, the elaborate and unique deposit/payment procedure involved the matching of specific items of deposit with specific drafts drawn on the depositor's account and the vice-president who performed the matching specifically and irrevocably committed the bank to honor the deposited items, while the depositor was on the premises. See id. at 1162-63.
 
 
 19
 The language of the "on premises" exception specifies that the depositor or his representative be on the premises at the time of "payment" or "withdrawal." It is clear that no Fran Impey representative was on the premises at the time of payment or withdrawal. We need not determine in this case whether we would find a "constructive payment" sufficient to fulfill the requirements of the exception in circumstances equivalent to those in Clarendon, where there was an irrevocable commitment to pay while the depositor was on the premises, because we find no such irrevocable commitment here. While Mitsui did make the funds immediately available, there is no evidence in the record which shows that the credits to Fran Impey's account were irreversible; indeed, Mitsui has never argued, either in the district court or on appeal, that they could not be reversed.
 
 
 20
 Thus, rather than the irrevocable commitment given by the vice-president in Clarendon, we find Mitsui's actions to be the type of routine extension of credit shown in Bradley Bank v. Hartford Accident and Indemnity Co., 737 F.2d 657, 660-61 (7th Cir.1984), where the court held that accepting deposited items and immediately crediting them to an account does not constitute constructive payment. This same conclusion was reached under similar circumstances in Bay Area Bank, 629 F.Supp. at 696-97. Accordingly, we hold that no "payment" or "withdrawal" occurred at the time Mitsui's operations officer initialed the deposit slip and thus the later withdrawal of funds attributable to the forged checks did not meet the "on premises" exception to the exclusion.
 
 
 21
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Lloyd D. George, United States District Judge for the District of Nevada, sitting by designation
 
 
 [1]
 The italicized phrase was added as a result of the Surety Association of America's 1976 Subcommittee Report, the significance of which we discuss in section III. The language after the word "EXCLUSIONS" is the "on premises" exception discussed in section V
 
 
 [2]
 Check-kiting schemes generally involve "the passing of checks between two or more banks to obtain unauthorized credit from each bank during the time it takes the checks to clear." Bay Area Bank v. Fidelity and Deposit Company of Maryland, 629 F.Supp. 693, 695 n.2 (N.D.Cal.1986)