730 A.2d 278

**FIRST UNION CORPORATION, et al.**

v.

**UNITED STATES FIDELITY AND GUARANTY COMPANY.**

**No. 1009, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

May 27, 1999.

Warren E. Zirkle (Elizabeth F. Edwards, Brian C. Riopelle and McGuire, Woods, Battle & Boothe, L.L.P., Richmond, VA, James P. Gillece, Jr., Michael J. Kresslein and McGuire, Woods, Battle & Boothe, L.L.P., Baltimore, on the brief), for appellants.

Gerson A. Zweifach (Dennis M. Black, Julia B. Shelton, Williams & Connolly, Washington, DC, Richard C. Burch, Andrew Janquitto and Mudd, Harrison & Burch, Towson, on the brief), for appellee.

Argued before SONNER, BYRNES and PATRICE E. LEWIS (specially assigned), JJ.

SONNER, Judge.

In November of 1993, Mr. Dick Nelson, a well regarded customer of Signet Bank as well as a member of its advisory

board, introduced two of his friends to one another. The meeting of those two friends led to the events that bring this case to us. Nelson owned a computer leasing company, Nelco, and one of his friends, Ed Reiners, had leased equipment from Nelco as an agent of a Fortune 500 company, Philip Morris. Reiners told Nelson about a new and secret undertaking called "Project Star" that Philip Morris was going to run "off shore," which was an effort to develop harmless tobacco by experimenting with human subjects. He said that, were such experiments to take place within the United States, it would be too controversial and perhaps illegal. At the very least, it would involve the scrutiny of federal agencies. For those reasons, Reiners said that the entire operation would take place outside of the United States. From the very beginning, he demanded strict confidentiality; the entire operation would have to be kept secret from all except a tightly limited few. Nelson understood.

In order to carry out the venture, Reiners maintained that he needed to lease $25 million worth of computer equipment. Nelson was in the computer leasing business and could help him there. Reiners would need a loan from a bank to do that and Nelson knew somebody who could help. Nelson quickly introduced Reiners to another very good friend, Connie Mooney, a "relationship manager" at Signet,[1] and also to two others, Mooney's boss and the chief credit officer at the bank. The five of them went to lunch, where Reiners explained the secret project to them. Even before the lunch, Nelson had passed on to Mooney what he understood about the transaction. This led her to draft a credit memorandum, in advance, seeking approval of a large loan to a company named "World Wide Regional Export," the company Nelson told her was the Philip Morris subsidiary formed to carry out the project and which was to be completely controlled by Reiners as the Chief Operating Officer.

---

1. First Union Corporation purchased Signet since the inception of this case. Signet properly filed a Notice of Substitution of Parties.

Signet then processed the credit application for World Wide Regional Exports through the bank's lending process, which included submission to Signet's credit committee. Mooney had priced the proposed loan terms and calculated the expected profit to Signet, calculations that showed it to be a most profitable undertaking for the bank as well as for Nelson and his leasing company. In a little over a month, Signet approved the loan and, in mid-December, made the first disbursement. Over the next twenty-eight months, Reiners obtained $300 million to carry out what he called "Project Star."

The routine practice for banking institutions with loans of that size is to syndicate the loans with other banks. This deal, which Signet internally called the "Stealth Loans," had several features that made marketing difficult, primarily because Reiners had insisted that all those involved with the loan at Signet sign a confidentiality agreement not to reveal Philip Morris's involvement in Project Star or to contact anybody at the company's headquarters in Richmond. In addition, the loan, unlike others of a similar nature, was not secured by any of the computers and other equipment that Reiners had agreed to purchase with the funds that the bank had already advanced. In keeping with the confidentiality agreement, Signet was not able to verify the delivery of any of the equipment or to communicate directly with anyone at Philip Morris.

When Signet attempted to market the Stealth Loans to other institutions, the vast majority of them refused to have anything to do with the offer, in spite of the fact that the financial terms were "above market." On March 17, 1996, an officer of one of the skeptical banks, Term Credit of Japan, ignoring the confidentiality agreement, contacted Philip Morris to check on the legitimacy of Project Star and to verify the authority of Reiners to act on behalf of Philip Morris. An officer from Phillip Morris faxed back information disclosing that the entire Project Star was bogus. The defrauded officials from Signet contacted the Federal Bureau of Investigation. Two days later, Ed Reiners was under arrest and in

federal custody.[2]

Signet was able to recover all but $35 million of the $300 million advanced to Reiners. This appeal is about who should bear that loss. Signet, as appellant, maintains that United States Fidelity and Guaranty Company ("USF & G"), which contracted with it to insure certain losses, should pay. On the other hand, the insurance contract, according to USF & G, excludes losses occasioned by frauds such as the one perpetrated on the bank by Reiners. USF & G consequently denied coverage and filed a complaint for declaratory judgment in the Circuit Court for Baltimore County. After a hearing on a motion for summary judgment, the court issued a six-page order granting USF & G's motion and entering judgment in its favor. In so doing, the court found specifically that two forged incumbency certificates, which Reiners submitted in order to establish his authority to act on behalf of Philip Morris, did not qualify for coverage as either "evidence of debt" or "instructions or advices."

Although appellant has raised several issues, this is essentially a dispute over the interpretation of the insurance contract that Signet negotiated with USF & G. The disputed terms were in Standard Form 24, a contract that resulted from negotiations between representatives of the banking and the surety industries. Signet interprets two provisions in Standard Form 24 to cover Reiners's fraud. Insuring Agreement (D)(2) provides coverage for loss resulting from

transferring, paying or delivering any funds or Property or establishing any credit or giving any value on the faith of any *written instructions or advices directed to the Insured and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or Property,* which instructions or advices purport to have been signed or endorsed by any customer of the Insured or by any banking institution but which instructions or advices either bear a signature which

---

**2.** Reiners pleaded guilty in federal court to bank fraud, in violation of Title 18 of the United States Code, § 1344, and to money laundering, in violation of Title 18 of the United States Code, § 1956(a)(1)(A).

is a Forgery or have been altered without the knowledge and consent of such customer or banking institution. . . .

(Emphasis added.) Moreover, under Insuring Agreement (E), USF & G agreed to indemnify Signet for

Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others, (1) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, any original

. . . .

(e) Evidence of Debt.

USF & G argues that Reiners, in the perpetration of his gigantic fraud, did not forge any papers that constituted evidence of debt. USF & G concedes that Reiners committed many dishonest acts, forged some signatures, and massively deceived those with whom he came in contact, but that none of those dishonest acts is covered by the terms of the contract. We agree.

A court should grant a motion for summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Maryland Rule 2–501(e) (1998). In reviewing the granting of a motion for summary judgment, the proper standard of review is whether the trial court was legally correct. *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 737, 625 A.2d 1005 (1993).

█ Signet first argues that the court below should have found the "incumbency certificates" that Reiners forged to be "evidence of debt" under Insuring Agreement (E)(1)(e) of the bond.

█ We initially note that Signet's interpretation of the bond is inconsistent with its history. Standard Form 24 has generally excluded losses caused by forgeries or loans made under false pretenses. Exclusion (a) provides that the bond does not cover "loss resulting directly or indirectly from forgery or alteration, except when covered under Insuring

Agreements (A), (D), (E) or (F)[.]" The rationale underlying this exclusion is to deny coverage for poor loan underwriting. Indeed, "[t]he failure to follow sound business practices and verify authenticity is a business risk taken by banks and not an insured risk covered by the [b]ond." *National City Bank of Minneapolis v. St. Paul Fire & Marine Ins. Co.*, 447 N.W.2d 171, 177 (Minn.1989).

With respect to the exceptions to Exclusion (a), the history of the bond reveals that they are to be construed narrowly. In 1980, representatives of the banking and surety industries amended Insuring Agreement (E) in order to narrow the number of documents that could qualify for coverage under that section. *See* Edgar L. Neel, *Financial Institution and Fidelity Coverage for Loan Losses*, 21 TORT & INS. L.J. 590, 614 (1986). Under the 1969 bond, Insuring Agreement (E) provided coverage for losses arising out of a bank's reliance on a forged "document." Because courts constructed this language broadly, the drafters of the 1980 amendments sought to limit its coverage by enumerating and defining the specific documents that come within its purview. The 1980 amendments to Standard Form 24 were also notable because the drafters, for the first time, included a definition of forgery, which turned out to be rather narrow.[3] Thus, as the history of Standard Form 24 demonstrates, the bond does not provide broad coverage for losses resulting from forgeries.

The preeminent case addressing "evidence of debt" is *Merchants National Bank of Winona v. Transamerica Insurance Co.*, 408 N.W.2d 651 (Minn.Ct.App.1987). In that case, GHK Construction Company applied for several commercial loans from Merchants National Bank. As a condition of issuing the loans, Merchants National required GHK to present it with fully executed construction contracts. Between 1980 and 1981, GHK's principal owner assigned two forged construction

---

**3.** The bond defines forgery as "the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose."

contracts to Merchants National. GHK eventually defaulted on the loans, and Merchants National filed a claim with its insurer, Transamerica, requesting indemnification for its losses under a Standard Form 24 Financial Institution Bond. Transamerica denied the claim on the grounds that the bond did not provide coverage for forged construction contracts. Merchants National filed suit, alleging that the forged construction contracts were "evidence of debt" under Insuring Agreement (E) of the bond. The trial court disagreed and, on appeal, the Court of Appeals of Minnesota held that " '[e]vidence of debt' refers to primary indicia of debt, such as promissory notes or other instruments that reflect a customer's debt to the bank." *Merchants National,* 408 N.W.2d at 653. The forged construction contracts, according to the Court, did not evidence GHK's debt to Merchants National and, accordingly, they did not constitute "evidence of debt."

Other cases interpreting "evidence of debt" in the Standard Form 24 Financial Institution Bond have reached similar results. *See, e.g., Portland Fed. Employees Credit Union v. Cumis Ins. Soc'y, Inc.,* 894 F.2d 1101 (9th Cir.1990); *Suburban Nat'l Bank v. Transamerica Ins. Co.,* 438 N.W.2d 119 (Minn.Ct.App.1989); *O'Brien's Irish Pub, Inc. v. Gerlew Holdings, Inc.,* 175 Ga.App. 162, 332 S.E.2d 920 (1985). We further note that the bond itself defines "evidence of debt" as "an instrument, including a Negotiable Instrument, executed by a customer of the Insured and held by the Insured which in the regular course of business is treated as evidencing the customer's debt to the Insured." The bond's own definition of "evidence of debt," therefore, is entirely consistent with the interpretation that various courts have given to it.

Turning to the facts of the present dispute, the forged incumbency certificates, like the construction contracts in *Merchants National,* fail to evince appellant's debt to appellee. Rather, the incumbency certificates simply represent that Edward Reiners is a high-ranking official of Philip Morris authorized to act on behalf of the company, and are not primary indicia of debt. Thus, the court properly found that

the documents do not qualify for coverage as "evidence of debt."

Nevertheless, relying principally on *Community State Bank of Galva v. Hartford Insurance Co.*, 187 Ill.App.3d 110, 134 Ill.Dec. 810, 542 N.E.2d 1317 (3d Dist.1989), and *Omnisource Corp. v. CNA/Transcontinental Insurance Co.*, 949 F.Supp. 681 (N.D.Ind.1996), appellant maintains that "evidence of debt" under a financial bond consists of multiple documents, and the court erred in limiting its analysis solely to the forged incumbency certificates.

In *Community Bank*, the Appellate Court of Illinois was called upon to decide whether a forged power of attorney was "evidence of debt." The forged power of attorney had been purportedly executed by a trustee, and appointed the forger, Leland Everett, as agent. The bank, relying on the power of attorney, loaned Everett $30,000 after Everett executed a forged promissory note in his capacity as the trustee's agent. Everett defaulted on the loan. After discovering the forgeries, the bank filed a claim with its insurer, Hartford Insurance Co., requesting indemnification under a financial institution bond. Hartford denied the claim and litigation ensued. The trial court found that the bank was entitled to coverage for its losses and the Court affirmed. In doing so, the Court declined to limit its analysis solely to the forged power of attorney; rather, the Court held that the power of attorney **and** the promissory note, when construed together, qualified as "evidence of debt" under Insuring Agreement (E)(1)(e).

■ Although *Community Bank* held that a court could theoretically construe more than one document as "evidence of debt," appellant's reliance on that case is misplaced. Insuring Agreement (E)(1)(e) provides coverage when an insured, in good faith, extends credit on evidence of debt that has been forged. Hence, in determining whether a forged document qualifies for coverage under Insuring Agreement (E), the object of the court's inquiry should be the contents of the **forged** document; i.e., what is the relationship between the forged document and the instrument of debt. In *Community*

*Bank,* the promissory note was executed pursuant to the forged power of attorney, and, therefore, the court properly considered them in its determination of the case. In this dispute, however, the documents evidencing the loan are not forgeries; Reiners signed them himself.

*Omnisource,* 949 F.Supp. 681, is also inapplicable to the facts of the present dispute. In *Omnisource,* the United States District Court for the Northern District of Indiana held that, in determining whether a sight draft and its supporting documents constituted a "covered instrument," the various documents should be construed as a whole. *Omnisource,* however, did not involve a Standard Form 24 Financial Institution Bond. In fact, the policy at issue in that case did not contain any provision even remotely similar to section (E)(1)(e) of the bond in this case.

▮ Appellant next contends that the incumbency certificates are "written instructions" and, accordingly, qualify for coverage under Insuring Agreement (D)(2) of the bond. Cases addressing the subject, however, have held that "instructions and advices" refer principally to commercial paper, such as checks and drafts. *See, e.g., KW Bancshares, Inc. v. Syndicates of Underwriters at Lloyd's,* 965 F.Supp. 1047, 1052 (W.D.Tenn.1997). The forged incumbency certificates in this case are clearly not commercial paper and, therefore, they do not constitute "instructions or advices."

Moreover, Insuring Agreement (D)(2) expressly refers to "written instructions or advices ... *authorizing or acknowledging the transfer, payment, delivery or receipt of funds or Property ...*" (Emphasis added.) Here, the incumbency certificates neither authorize nor acknowledge the payment or transfer of money or property; in fact, they do not even mention loans, funds, or payments. The court properly found that the incumbency certificates did not qualify for coverage as "instruction or advices."

▮▮ We finally note that the record fails to disclose that appellant actually relied on the forged incumbency certificates in approving and issuing the loans to Reiners. Insuring

Agreement (D)(2) provides coverage when the insured transfers, pays, or delivers funds "on the faith of" any written instructions or advices. Similarly, under Insuring Agreement (E)(1)(e), there is coverage only when the insured extends credit "on the faith of" some evidence of debt. Courts have interpreted the language, "on the faith of," as signifying reliance. *See, e.g., Republic Nat'l Bank of Miami v. Fidelity & Deposit Co. of Maryland,* 894 F.2d 1255, 1263 (11th Cir. 1990); *United States Nat'l Bank in Johnstown v. Reliance Ins. Co.,* 348 Pa.Super. 30, 501 A.2d 283, 285 (1985); *Continental Bank v. Phoenix Ins. Co.,* 24 Cal.App.3d 909, 101 Cal.Rptr. 392 (1972). Hence, in order for there to be coverage under Insuring Agreement (D)(2) or (E)(1)(e), the insured must demonstrate that it actually relied upon the instructions or advices or the evidence of debt. In this case, Connie Mooney, the Senior Vice President of First Union, testified at deposition that the loan committee had not received the incumbency certificates when it approved the loans. Thus, appellant failed to prove that it issued the loans "on the faith of" the two forged incumbency certificates. The trial court was correct in entering summary judgment in favor of appellee.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**