**USA LIFE ONE INSURANCE COMPANY OF INDIANA, Appellant–Defendant,**

v.

**MARSHALL L. NUCKOLLS, as Personal Representative of the Estate of Robert L. Nuckolls, Deceased; Marshall L. Nuckolls and Ada Nuckolls, Appellees– Plaintiffs.**

No. 11A04–9506–CV–229.

Court of Appeals of Indiana.

April 10, 1996.

J. Lamont Harris, Henthorn, Harris & Taylor, Crawfordsville, for appellant.

John P. Nichols, Anderson & Nichols, Terre Haute, for appellees.

## OPINION

SULLIVAN, Judge.

Upon interlocutory appeal, USA Life One Insurance Company of Indiana (USA) challenges the denial of its summary judgment motion in an action brought against USA by Marshall and Ada Nuckolls (Nuckolls) regarding a life insurance policy issued to the Nuckolls' deceased son, Robert L. Nuckolls. USA presents the following restated issues for review:

I. Did the trial court err in determining that the accidental death rider of the life insurance policy did not exclude coverage for Robert Nuckolls' death?

II. Did the trial court err in determining that punitive damages are not unavailable in the Nuckolls' action against USA?

We reverse.

The undisputed facts are that in the early morning hours of January 13, 1991, Gary Miller discovered a car on fire on a rural Clay County road and summoned the fire department. After the fire was extinguished, a body was discovered inside the car and was subsequently identified as that of Robert Nuckolls. Following an autopsy, a coroner's report was filed classifying the death as accidental. With regard to the cause of death, the report stated:

> "Dr. [Roland] Kohr said the man had died from Carbon Monoxide Poisoning due to breathing the fumes from the early part of a smoldering fire within the car's interior. Police and fire investigators theorized that Nuckolls, a known smoker of cigarettes, had fallen asleep while his car was parked on the road, and that the burning cigarette had started the fire. The victim's blood alcohol content tested at .294 percent, nearly 3 times the legal level for vehicle operators, which is .10 percent. Nuckoll's [sic] degree of intoxication undoubtedly contributed to his death." Record at 51.

USA had issued a life insurance policy naming Robert as the insured and Marshall and Ada Nuckolls as beneficiaries. Along with basic life insurance coverage, Robert also purchased a policy rider providing additional benefits in the amount of $10,000 in the event of accidental death. On January 29, 1991, the Nuckolls filed a beneficiaries' claim statement. USA admitted liability for the basic life insurance benefit but denied coverage on the accidental death benefit. In denying the accidental death benefit, USA noted that the insurance policy contained the following provision:

> "EXCEPTIONS. The accidental death benefit is not payable for death resulting directly or indirectly from:
>
> \* \* \* \* \* \*
>
> (g) taking of poison or gas, whether voluntarily or involuntarily, accidental or otherwise, except with direct relation to the Insured's occupation;"

Record at 14. Although the coroner's report stated that carbon monoxide poisoning was the cause of death, it also concluded that Robert's intoxication was a contributing factor. USA denied coverage of the accidental death benefit on the ground that Robert's death was caused by "the combined effect of two poisons, carbon monoxide and ethanol (grain alcohol)." Appellant's Brief at 8.

On January 8, 1993, Nuckolls filed a complaint for damages against USA alleging breach of contract for wrongful failure to pay the accidental death benefit, seeking compensatory damages. On December 30, 1993, Nuckolls filed an amended complaint, adding a claim for punitive damages based upon the allegation that USA failed to deal with Nuckolls in good faith. On April 29, 1994, USA filed a motion for summary judgment, claiming that there existed no genuine issue as to the material fact that Robert's death was caused by a poison or gas and that such cause of death was excluded by the terms of the accidental death benefit rider. On May 4, 1995, the trial court denied USA's sum-

mary judgment motion. On June 8, 1995, the trial court certified its May 4 ruling for interlocutory appeal.

USA contends that the trial court erred in denying its motion for summary judgment because there exists no genuine issue of material fact regarding the dispositive issues of the case, i.e., the cause of Robert's death and the subject of the exclusion set out in subsection (g) of the "Exceptions" section of the Additional Benefit Provision for Accidental Death rider of Robert's life insurance policy.

■ We are called upon to determine whether the circumstances of Robert's death fit within the description contained in subsection (g) of the Exceptions provision of the Accidental Death rider. As noted, USA contends that the matter is settled by reference to the portion of the coroner's report which states carbon monoxide poisoning as the cause of death and also lists Robert's high blood-alcohol content as a contributing factor. USA argues that carbon monoxide and grain alcohol are both poisons within the meaning of subsection (g), thereby constituting exceptions to the coverage extended in the Accidental Death rider. The Nuckolls do not argue that carbon monoxide and grain alcohol are not poisons within the meaning of subsection (g), but rather that there remains a question of fact as to whether Robert died as a result of "taking" carbon monoxide and grain alcohol, as that term is used in subsection (g).[1] Therefore, the focus of our inquiry is the meaning of "taking" as contemplated in the contract for accidental benefits. We have previously defined our task when confronted with questions regarding the meaning of exclusionary provisions in an insurance contract.

"The general rule in interpreting insurance contracts, and all other contracts of adhesion, is that, in the normal case, the court must simply apply the plain ordinary meaning of the contract language. In cases of ambiguity, where more than one reasonable interpretation is possible, and especially where a coverage exclusion is involved then the court must adopt the interpretation most favorable to the in-

sured." *Comprehensive Health Ins. Ass'n v. Dye* (1988) Ind.App., 531 N.E.2d 505, 507.

In the instant case, the insurance policy does not define "taking". However, Nuckolls concedes that "taking" includes "to ingest". Appellee's Brief at 2. It is clear and without any suggestion of doubt that Robert "ingested", i.e., breathed, the carbon monoxide gas. The only remaining question is whether the word "ingest" necessarily means that the ingestion had to be intentional or voluntary. Although this question is not presented by Nuckolls, the intentional/voluntary premise is suggested by the dissent, albeit without citation of authority.

Our research has disclosed no case in Indiana since 1926 dealing with "poison" and with a "voluntary" vs. "involuntary" consideration. *Miller v. Fort Wayne Mercantile Accident Ass'n* (1926) 87 Ind.App. 561, 153 N.E. 427. In *Miller,* decedent died from accidentally swallowing calbolic acid, thinking it to be medicine for his cold. The policy excluded coverage for "death caused ... or resulting from ... injury (fatal or otherwise) resulting from any poison ... or from anything accidentally or otherwise taken, administered, or inhaled." 87 Ind.App. at 562, 153 N.E. at 427.

The decedent's estate argued that "there must be a conscious taking of the poison ...". 87 Ind.App. at 563, 153 N.E. at 428. The court discussed authorities upon both sides of the voluntary-involuntary issue, but held that there was no coverage because death resulted from poison. The holding did not rest upon any distinction between voluntary and involuntary ingestion, and stated that although the death was accidental, it resulted from poison and was not covered.

The court made a somewhat cryptic comment, however:

"It would seem that the insurance contract in the instant case was drawn with the express purpose of excluding liability for death caused by the voluntary inhalation of gas, and to cover death when caused by

---

1. In their appellate brief, the Nuckolls note not only that the insurance contract fails to define

"taking", but also that it does not define "poison".

involuntary inhalation." 87 Ind.App. at 570, 153 N.E. at 430.

The comment made, gratuitously and curiously, by the court is totally outside the context of the case which was before the court, and the decision does not point to any policy provision relative to inhalation of gas. The only mention of that type of coverage was in the Accident Association Constitution which, contrary to the cryptic comment, said:

"[The Association is exempt from liability for] injuries arising from voluntary or involuntary, conscious or unconscious inhalation of any gas, anesthetic, fumes or vapor; [or] from anything accidentally or otherwise taken, administered, absorbed, or inhaled." 87 Ind.App. at 563, 153 N.E. at 428 (internal quotation marks omitted).

Absent some provision in Miller's insurance contract stating that involuntary inhalation is covered, there is absolutely no basis for the latter statement. In this regard, however, with respect to the "poison" question, the court held that any arguable inconsistency between the Constitution and the insurance contract is governed by the contract.

 The principles governing application of contract terms are well established. The fact that a term is not defined does not render it ambiguous. *Harden v. Monroe Guaranty Ins. Co.* (1993) Ind.App., 626 N.E.2d 814, *trans. denied.* An unambiguous policy must be enforced according to its terms, including terms limiting liability. *Pennington v. American Family Ins. Group* (1993) Ind.App., 626 N.E.2d 461. An insurer is free to limit coverage if that limitation is clearly expressed. *Delaplane v. Francis* (1994) Ind.App., 636 N.E.2d 169, *trans. denied.* Courts are not free to ignore the plain wording of an insurance contract. *Losiniecki v. American States Ins. Co.* (1993) Ind.App., 610 N.E.2d 878.

There is no ambiguity in the exclusion provision here involved. As conceded by Nuckolls, the word "take" has a synonym—"ingest". There can be no doubt that Robert "ingested" the carbon monoxide which caused his death, even if his state of intoxication was a contributing factor. There is also no doubt that the policy provision excludes such ingestion "whether voluntarily or involuntarily, accidental or otherwise". The clear language of the policy precludes any gratuitous limiting or contrary interpretation. Without the existence of an ambiguity, to write out of the contract the words "or involuntarily" is to rewrite the contract made by the parties. *Firemen's Ins. Co. Of Newark N.J. v. Temple Laundry Co.* (1924) 195 Ind. 194, 144 N.E. 838. The principle enunciated in the last century remains applicable today and to this case: "This result may work a hardship to the [decedent's survivors], but courts cannot make contracts for parties." *Pacific Mutual Ins. Co. of California v. Howell* (1895) 13 Ind.App. 519, 521, 41 N.E. 968, 968.

The exclusion clause is clear and unambiguous. It provides that accidental benefits will not be paid if death results from the ingestion of carbon monoxide gas "whether voluntarily or involuntarily, accidental or otherwise ...". Whether Robert passed out in an intoxicated state while smoking a cigarette and could not help ingesting the carbon monoxide fumes, is not relevant. Even if he ingested the fumes involuntarily and accidentally, the policy does not cover the loss.

Because we reverse the denial of USA's motion for summary judgment it is unnecessary to decide the issue presented with respect to the availability of punitive damages against USA.

The judgment is reversed and the cause is remanded with instructions to grant USA's motion for summary judgment.

SHARPNACK, C.J., concurs.

FRIEDLANDER, J., dissents with separate opinion.

FRIEDLANDER, Judge, dissenting.

I believe that the trial court was correct in denying USA's motion for summary judgment and therefore respectfully dissent from the majority's determination that USA is entitled to judgment as a matter of law.

An intoxicated man was sitting in his parked car smoking a cigarette when he passed out, presumably as a result of his intoxication. The cigarette fell from his

hand, the car ignited, and the man was unable to escape. The fire consumed the car and its occupant before it could be extinguished by emergency personnel. As is common in deaths resulting from fire, a subsequent autopsy determined that the official cause of the man's death was carbon monoxide poisoning. The question we are called upon to answer is essentially this: Can the cause of the man's death be fairly described as the "taking of poison or gas, whether voluntarily or involuntarily accidental or otherwise", as provided in an exclusionary clause of an accidental death life insurance policy? *Record* at 14. I agree with the trial court's conclusion that it cannot.

The majority correctly begins its analysis of the policy provision's meaning by focusing on the term "taking". Does involuntarily inhaling the toxic fumes which are the inevitable by-products of a fire, while trapped in a fire, constitute "taking poison"? The majority concludes that it does. In arriving at this conclusion, the majority focuses on the real crux of the matter: Does "taking", as used in the accidental death policy exclusionary provision, contemplate both voluntary and involuntary actions? To answer this question, the majority, noting that the policy does not define the term "taking", observes that one acceptable meaning of the term "taking" is "to ingest". Concluding that Robert died as a result of "ingesting" (a term that is sanitized of voluntary-versus-involuntary connotations) carbon monoxide, the majority determines that "ingesting (and therefore 'taking') a poison" unambiguously includes involuntarily breathing the poisonous by-products of a fire while trapped in the fire. In my view, the majority's analysis misses the mark in that it incorrectly construes the meaning of a synonym of the term in question, i.e., "ingesting", and not the critical term itself, i.e., "taking".

While it is true that "ingesting" is one meaning of "taking", such is not the only meaning. The *Random House Dictionary of the English Language* (1967) lists ninety-two separate and widely varied meanings for the word "take", including "to receive and accept willingly", *id.* at 1448, and other definitions indicating that the term is sometimes used to indicate voluntary and willing action. Therefore, I believe that the majority's analysis is incorrect in that it selects one synonym from among multiple alternatives and construes the meaning of the provision in question after replacing the original word with the selected synonym. It is not our task to construe the meaning of "taking" in the abstract, to randomly select a meaning from among alternative meanings, without regard for the circumstances of the case. Rather, we can determine the meaning of the term only after considering it in the context in which it was used in the particular case and the nature of the instrument in which it was employed. *Aetna Cas. & Sur. Co. v. Crafton,* 551 N.E.2d 893 (Ind.Ct.App.1990).

As the majority states, the general rule of interpretation to which courts adhere when considering insurance contracts is that we will apply the plain and ordinary meaning of the language employed in the contract. *Comprehensive Health Ins. Ass'n v. Dye,* 531 N.E.2d 505 (Ind.Ct.App.1988). If more than one reasonable interpretation is possible, the court adopts the interpretation most favorable to the insured. *Tate v. Secura Ins.,* 587 N.E.2d 665 (Ind.1992). USA Insurance advocates a broad definition of the term "taking", making it synonymous with "caused by", thereby excluding coverage for any death caused by poison or gas. While "taking" may theoretically be so interpreted, the rules of construction set forth in *Comprehensive Health Ins. Ass'n* compel me to assign ordinary meaning to words employed in an insurance contract and "taking" is not ordinarily understood to be tantamount to "caused by." Yet, the meaning ascribed to the term by the majority achieves such a result.

The primary goal when construing the meaning of insurance policies is to effectuate the intent of the parties as manifested in the insurance contract. *Lexington Ins. Co. v. American Healthcare Providers,* 621 N.E.2d 332 (Ind.Ct.App.1993), *trans. denied.* To construe the policy as the majority has done effectively means that, in an overwhelming majority of cases, there will be no coverage in the event that death is caused by a fire for persons obtaining an accidental death policy

containing this language. It is common knowledge that many people who die in fires are not killed by the flames themselves. Many times, as here, the official cause of death is carbon monoxide poisoning. The majority's interpretation yields the following result: Robert would have been covered by the policy had he burned to death before succumbing to the carbon monoxide gas, but he is not covered because the gas overcame him first. I find this result illogical and inconsistent with the intent of the parties. I believe that when Robert Nuckolls purchased the accidental death rider policy, he believed that coverage would attach in the event that his death was caused by accidental fire. Indeed, if incineration had been listed as the official cause of death, coverage would not have been denied on the basis that Robert died as a result of taking a poison.

I would reject USA's attempt to seize upon a technicality regarding the official cause of death in denying coverage. I firmly believe that the average person, when apprised of the circumstances of Robert's unfortunate death, would not respond to the question, "How did Robert die?" with the answer, "He took gas." "Taking gas" has a meaning in our everyday language that is at odds with the meaning which the majority has ascribed it in this context. "Taking" ordinarily connotes an act of volition or intention. Thus, "taking a poison or gas", as that phrase is used in subsection (g), should be understood to mean only the *intentional* ingestion or inhaling of such substances or gases while aware of the dangerous nature of the substance being ingested. Moreover, when viewed contextually, this definition lends internal consistency to the accidental death rider.

The rider provides coverage for accidental death, but logically excludes coverage for death caused by particular volitional acts designated for exclusion because of their potentially lethal consequences. This interpretation is preferable not only because it incorporates the ordinary meaning of the term "taking" and it lends internal consistency to

the exclusionary policy, but also because it resolves the ambiguity resulting from the qualifying phrase, "whether voluntarily or involuntarily", in favor of the insured. *Dye, supra.*

Based upon my conclusion that dying of smoke inhalation in a fire is not "taking a gas or poison", I must also address a second argument made by USA. The Clay County Coroner concluded that the high blood-alcohol content in Robert's blood at the time of the fire was a contributing cause of death. Because it may reasonably be inferred that Robert intentionally ingested the alcohol, USA argues that alcohol is a poison within the meaning of subsection (g), thereby excluding coverage under the accidental death rider.

As stated previously, the meaning of "poison" in subsection (g) must be construed in a fashion consistent with its ordinary meaning. *Dye, supra.* Generally, a poison is a substance which has an inherent property that, by itself, tends to destroy life or impair health. While alcohol may endanger or destroy life or impair health when ingested in excessive amounts, the same is true of many substances that are not considered to be poison in the ordinary sense.[2] Therefore, "poison" within the meaning of subsection (g) means a substance that, by itself, tends to destroy life or impair health if taken in relatively moderate amounts. The alcohol contained in alcoholic beverages is not such a substance and therefore is not a poison within the meaning of subsection (g).

Based upon my conclusion that the term "taking" is sufficiently ambiguous to require construction of the meaning of subsection (g), and that the term ordinarily connotes a volitional and voluntary act, I am convinced that Robert's death was not the result of "taking a poison" within the meaning of subsection (g). I conclude also that alcohol is not a poison within the meaning of subsection (g). Therefore, the cause of death was not excluded by the terms of the accidental death rider and USA was obligated to pay the policy

---

**2.** Moreover, in the instant case, alcohol was a contributing cause of Robert's death only because it created conditions, i.e., intoxication and a high level of blood-alcohol content, making Robert more vulnerable to the fire and the deadly effects of the carbon monoxide gas.

proceeds to the designated beneficiary. I would affirm the trial court.

