**OMNISOURCE CORP., Plaintiff,**

v.

**CNA/TRANSCONTINENTAL INSURANCE COMPANY, Defendant.**

**No. 1:95–CV–324.**

United States District Court, N.D. Indiana, Fort Wayne Division.

Nov. 25, 1996.

Thomas A. Herr, James Fenton, Cathleen M. Shrader, Barrett and McNagny, Fort Wayne, IN, for plaintiff Omnisource Corp.

Leonard E. Eilbacher, Craig J. Bobay, Brian L. England, Hunt Suedhoff, Borror, & Eilbacher, Fort Wayne, IN, for defendant CNA/Transcontinental Ins. Co.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

### I. INTRODUCTION

This matter is before the Court[1] on cross motions for summary judgment. The record before the Court consists of the pleadings and the following affidavits: Kathleen A. Hurst ("Hurst aff. ——"); Charles Quinby ("Quinby aff. ——"). The Defendant, CNA/Transcontinental Insurance Company ("CNA") moved for summary judgment on August 15, 1996. On September 16, 1996, the Plaintiff, Omnisource Corporation ("Omnisource"), responded to the first motion and filed its cross motion. CNA filed a joint reply-response on October 4, 1996. Finally, on October 15, 1996, Omnisource replied. This Court has jurisdiction based on diversity, 28 U.S.C. § 1332, and the parties apparently agree that Indiana law applies.

For the reasons hereinafter provided, Omnisource's motion for summary judgment will be GRANTED and CNA's motion will be DENIED.

### II. FACTUAL BACKGROUND

The present case arises from a declaratory judgment action brought by Omnisource in which it seeks coverage from its insurer, CNA. The parties agree on the pertinent facts and dispute only whether Omnisource is entitled to coverage. The question before the Court is whether a loss arising from a letter of credit transaction[2] undertaken by

1. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

2. Under this type of transaction,
 the buyer ("customer" or "applicant") applies [to its bank] for issuance of an irrevocable letter of credit which commits [the] bank ("issuer") to pay a draft drawn by the seller ("beneficiary") upon proper presentation of the draft and any documents required by the letter of credit. These documents [which may include the bill of lading] must comply with the requirements expressed in the letter of credit.
 3 James J. White & Robert S. Summers, *Uniform Commercial Code: Practitioner Treatise Series* § 26–1 at 107 (4th ed. 1995) (hereinafter "White & Summers"). The particular transaction in question will be discussed in more detail *infra*.

Omnisource with a foreign company, Metales Especializados (hereafter "Metales") was a "covered loss" within the meaning of the policy. Before turning to this legal issue, a narrative recitation of the undisputed facts is in order.

Omnisource is in the business of buying and selling scrap metal. (Complaint ¶ 6.) On or about July 5, 1994, it entered into a purchase contract with Metales, a purported Costa Rican firm, whereby Metales agreed to sell Omnisource a large quantity of scrap copper ("the underlying contract"). (*See* Pl. Compl. exhs. B & C.)

The contract required payment through a letter of credit. (*Id.* ¶ 11.) Omnisource thus arranged for the letter of credit to be issued by its bank, Bank One ("Bank One"). (*Id.* ¶ 11; *see* Pl.Compl. exh. D.) Omnisource provided to Bank One an application and agreement for an irrevocable letter of credit (Pl.Compl. exh. D.) in favor of Metales up to an aggregate amount of $248,724.00. The application/agreement further provided that drafts and documents must be dated and negotiated not later than August 22, 1994, in Costa Rica. (*Id.*) The application/agreement then provided that the letter of credit would be available upon presentation of a sight draft [3] accompanied by:

1. a commercial invoice in original;
2. a certificate of origin;
3. a packing list;
4. a full set clean on-board ocean bills of lading relating to shipment;
5. war/marine insurance to be provided by the buyer.

(*Id.*) ("the supporting documents") (*see* Hurst aff. ¶ 6). Bank One then issued a letter of credit on these requested terms and transmitted it to the confirming bank,[4] Barnett Bank of Miami ("Barnett Bank"). (Compl. ¶ 12; *see* Pl.Compl. exh. E.)

Thereafter, someone presented to the Barnett Bank a sight draft that was drawn on the Barnett Bank and entitled "Letter of Exchange." (*See* Pl.Compl. exh. F.) It was purportedly payable "at sight" to the order of Metales in the amount of $260,000.20. It further provided:

> The drawer as well as the drawee, endorser or guarantor, as well as any person(s) that intervene(s) in this letter of exchange, have renounced to their address, demands for payment, procedure for legal action for lack of acceptance and/or payment, authorizing herein an extension without any previous advise or notification.

(*Id.*) The Letter of Exchange was purportedly (but illegibly) signed by Metales. (*Id.*)

The required supporting documents were also presented to Barnett Bank along with a sight draft. (*Id.* ¶ 13.) Because they appeared on their face to be in good order, the bank paid the amount stated on the sight draft to the person presenting the documents. *See* Dolan, *supra*, § 6.01 at 6–2. With the payment of the sight draft by the bank, Omnisource immediately became obligated to it for the amount paid under the letter of credit. (Pl.Compl. Exh. F, ¶ 14)

The shipment of copper to which the ocean bill of lading referred never arrived. (*Id.* ¶ 14.) CNA concedes that the supporting documents were forged. (Compl. ¶ 13; Ans. ¶ 13; *see* Br. in Supp. of CNA Mot. for Summ.J. at 17).[5] Thus, the bill of lading received by Barnett Bank was worthless. Nonetheless, Omnisource was obliged to reimburse Bank One for the amounts paid upon the irrevocable letter of credit. *See* White & Summers, *supra*, § 26–1 at 108. As a result, Omnisource sustained a loss of $261,160.20. (Compl. ¶ 14.)

During the relevant time period, Omnisource was insured by a policy issued by CNA which provided in pertinent part:

---

**3.** A draft has been defined as a "[n]egotiable instrument that orders the payment of money." John F. Dolan, *The Law of Letters of Credit* at G–11 (Rev. ed. 1996). A sight draft is a "[d]raft that calls for payment upon presentation." *Id.* at G–24.

**4.** A confirming bank, which has the same rights and duties as the issuing bank, promises to pay on the letter of credit. "After payment, the confirming bank has a right of reimbursement from the issuing bank." White & Summers, *supra*, § 26–13 at 202.

**5.** Although CNA originally admitted that sight draft was forged as well, this Court permitted CNA to withdraw that admission. (*See* Order, Aug. 9, 1996.)

FORGERY OR ALTERATION
COVERAGE FORM

(Coverage Form B)

A. COVERAGE

We will pay for loss involving Covered Instruments resulting directly from the Covered Causes of Loss.

1. **Covered Instruments:** Checks, drafts, promissory notes, or similar written promises, orders, or directions to pay a sum certain in "money" that are:

 a. Made or drawn by or drawn upon you;

 b. Made or drawn by one acting as your agent;

 or that are purported to have been so made or drawn.

2. **Covered Causes of Loss:** Forgery or the alteration of, on or in any Covered Instrument.

(Compl. ¶ 15; Ans. ¶ 15.) ("the coverage provision"). Omnisource made a demand upon CNA for payment under the policy which CNA rejected. (Compl. ¶ 17.)

CNA contends that the contract for insurance must be enforced according to its precise terms, and that the instruments at issue were not "checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in money that are made or drawn by or drawn upon Omnisource within the terms of the policy." CNA also contends that the sight draft was not a "covered instrument" because it was not a "forgery." Finally, CNA challenges whether any purported loss resulted "directly from" the forgery.

Omnisource contends that the documents presented to the Barnett Bank must be viewed as a whole and thus constitute an instrument covered under the policy. Moreover, Omnisource maintains that they were "drawn upon" Omnisource and that its loss arose "directly from" the forgery in the supporting documents. The Court will addresses these respective issues, after first reciting the applicable legal standard.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512; *In re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High Sch. Dist. No. 204,* 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which demonstrate the

absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion, the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence nor the credibility of witnesses. *Anderson,* 477 U.S. at 249–51, 106 S.Ct. at 2511. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Ill. Nat'l Bank,* 704 F.2d 361, 367 (7th Cir.1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *First Nat'l Bank of Cicero v. Lewco Sec. Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512.

## IV. DISCUSSION

The Court will first review the governing principles of Indiana contract law, and then turn to application of those principles to the facts at hand.

### A. Indiana Contract Law

Indiana has certain well-established rules regarding the interpretation of insurance contracts. "Under Indiana law, the interpretation of an insurance policy presents a question of law to be decided by the court." *Cincinnati Ins. Co. v. Flanders Electric Motor Service, Inc.,* 40 F.3d 146, 151 (7th Cir. 1994) (citing *Tate v. Secura Ins.,* 587 N.E.2d 665, 668 (Ind.1992)). "[C]onstruction of a written contract is a question of law for which summary judgment is particularly appropriate." *Transcontinental Technical Servs., Inc. v. Allen,* 642 N.E.2d 981, 983 (Ind.Ct.App.1994), *trans. denied,* Mar. 9, 1995 (citing *Delaplane v. Francis,* 636 N.E.2d 169, 171 (Ind.Ct.App.1994), *trans. denied,* Nov. 9, 1994).

"When interpreting an insurance policy, our goal is to ascertain and enforce the parties' intent as manifested in the insurance contract." *Conrad v. Universal Fire & Cas. Ins. Co.,* 670 N.E.2d 936, 937 (Ind.Ct.App. 1996) (citation omitted). Clear and unambiguous language in an insurance policy must be given its plain and ordinary meaning. *Cincinnati Ins. Co.,* 40 F.3d at 151 (citing *Fidelity & Guar. Ins. Underwriters v. Everett I. Brown Co.,* 25 F.3d 484, 486 (7th Cir.1994)). "[W]here there is an ambiguity, policies are to be construed strictly against the insurer." *Sutton v. Littlepage,* 669 N.E.2d 1019, 1021 (Ind.Ct.App.1996) (citing *American States Ins. Co. v. Kiger,* 662 N.E.2d 945, 947 (Ind. 1996)). "This is particularly true where a policy excludes or limits coverage." *Id.* (citing *Delaplane,* 636 N.E.2d at 171). "Strict construction means that the insurer is bound by the plain and ordinary meaning of the words viewed from the standpoint of the insured." *Id.* (citing *Tate,* 587 N.E.2d at 668). Strict construction is "driven by the fact that the insurer drafts the policy and foists its terms upon the customer." *Id.* (citing *Kiger,* 662 N.E.2d at 947).

At the same time, "a court cannot create an ambiguity where none exists; 'if no ambiguity exists the policy will not be interpreted

to provide greater coverage than the parties bargained for....'" *Cincinnati Ins. Co.*, 40 F.3d at 151 (quoting *Alexander v. Erie Ins. Exchange,* 982 F.2d 1153, 1157 (7th Cir. 1993)). "An insurance contract is ambiguous 'when it is susceptible to more than one interpretation and reasonably intelligent men would differ as to its meaning.'" *Transcontinental Technical Servs.,* 642 N.E.2d at 983 (quoting *Harden v. Monroe Guaranty Ins. Co.,* 626 N.E.2d 814, 817 (Ind.Ct.App.1993), *trans. denied,* June 22, 1994).

## B. The Present Motion

The policy provided, in pertinent part:

We will pay for loss involving Covered Instruments resulting directly from the Covered Causes of Loss.

 1. **Covered Instruments:** Checks, drafts, promissory notes, or similar written promises, orders, or directions to pay a sum certain in "money" that are:

 a. Made or drawn by or drawn upon you;

 b. Made or drawn by one acting as your agent; or that are purported to have been so made or drawn.

 2. **Covered Causes of Loss:** Forgery or the alteration of, on or in any Covered Instrument.

(Compl. ¶ 15; Ans. ¶ 15.) CNA challenges coverage, claiming that: the sight draft and the supporting documents presented to Barnett Bank do not constitute a "covered instrument"; that the forgery of the supporting documents was not a "covered cause of loss"; and that Omnisource's loss did not "result[ ] directly from" a covered cause of loss. The Court rejects each of CNA's challenges to coverage. At bottom, because the provision is, at best, ambiguous, the Court must strictly construe it against the insurer. *See Sutton,* 669 N.E.2d at 1021. This conclusion is based on the unique factual setting of this case: Omnisource's choice to pay for the copper in the underlying contract via letter of credit.

## 1. Whether the Sight Draft and Supporting Documents Constituted a "Covered Instrument."

 CNA contends that the sight draft and supporting documents did not constitute a "covered instrument" on two grounds: 1) they did not constitute "[c]hecks, drafts, promissory notes, or similar written promises, orders, or directions to pay a sum certain in 'money'"; and, 2) they were not "[m]ade or drawn by or drawn upon [Omnisource]," nor "[m]ade or drawn by one acting as [Omnisource's] agent," nor were they "purported to have been so made or drawn." The Court resolves each of these challenges in Omnisource's favor.

### a. The sight draft and the supporting documents must be construed together.

CNA admits that the sight draft, standing alone, is a covered instrument, but denies that it was forged. Not surprisingly, CNA maintains that the supporting documents (which were concededly forged) must each be viewed independently, rather than "bundled" with the sight draft to constitute a single instrument. In this light, CNA then asserts that none of them constitutes a "[c]heck[ ], draft[ ], promissory note[ ], or similar written promise[ ], order[ ], or direction[ ] to pay a sum certain in 'money,'" as defined by Indiana's version of the Uniform Commercial Code ("U.C.C.").

In response, Omnisource contends that the sight draft and the supporting documents must be construed as one single instrument since each was necessary for Barnett Bank to honor the sight draft; as a result, it argues, they constitute a "promise[ ], order[ ], or direction[ ] to pay a sum certain in 'money.'" Omnisource also takes issue with reliance on U.C.C. definitions because the contract neither provides that they will control nor otherwise defines the terms. Rather, Omnisource asserts that the language must be construed in terms of its plain and ordinary meaning.

CNA apparently assumes, without stating, that U.C.C. definitions of terms are incorporated into this contract as a matter of law. However, "[t]he [U.C.C.] does not apply to the formation, performance, and enforcement

of insurance contracts."[6] James J. White & Robert S. Summers, *Uniform Commercial Code: Hornbook Series* § 2 at 6 (2d ed. 1980). Rather, "[t]he general rule in interpreting insurance contracts, and all other contracts of adhesion, is that, in the normal case, the court must simply apply the plain ordinary meaning of the contract language." *Wischmeyer v. Paul Revere Life Ins. Co.*, 725 F.Supp. 995, 1001 (S.D.Ind.1989) (citation omitted); *see LaForge v. American Cas. Co.*, 37 F.3d 580, 583 (10th Cir.1994). Thus, CNA's attempt to pigeon-hole the terms at issue into their meaning under the U.C.C. is unavailing.

■ Since the insurance contract does not define the terms at issue, the Court applies the "plain and ordinary meaning" of the coverage provision. *See Cincinnati Ins. Co.*, 40 F.3d at 151; *Washington Nat'l Corp. v. Sears, Roebuck, & Co.*, 474 N.E.2d 116, 121 (Ind.Ct.App.1985) ("Language in a contract should be given its plain and ordinary meaning unless a particular term is used in a manner intended to convey a specific technical concept"); *American Ins. Co. v. First Nat'l Bank*, 409 F.2d 1387, 1390 (8th Cir. 1969) (applying Missouri law) (Terms "not defined in the contract ... must be given their plain and ordinary meaning.").

Therefore, the question becomes whether the presentation of the sight draft along with the supporting documents that were required by the letter of credit, which obliged Barnett Bank to pay the face amount of the sight draft, was an order or direction to pay a sum certain in money. Viewed in this light, the only reasonable interpretation of this language is that, construed together, these documents constitute a covered instrument.

Although CNA would have the Court view them individually, this position overlooks the fact that, under the terms of the letter of credit, (*see* Pl.Compl. exh. D.), each document was necessary to oblige Barnett Bank to honor the sight draft. Viewing all parts of the transaction as a whole underscored the

Seventh Circuit's reasoning in *U.S. v. Tucker*, 773 F.2d 136, 138 (7th Cir.1985). There, two parties engaged in an international sale contract and the buyer applied to a bank for a letter of credit in order to effect payment. *Id.* Forged documents stating that the goods were *en route* were thereafter presented to the bank, and the bank paid the letter of credit. *Id.* The court held that these forgeries were within the scope of a criminal statute that punished "false statements made to influence a bank's action 'upon any application, advance, ... [or] commitment....'" *Id.* at 139. The court looked at the transaction as a whole and determined that it fit within the statute: the bank was committed to pay upon presentation of the required documents and "the forged documents were in support of an 'application' designed to induce the bank to honor its 'commitment' and 'advance' funds to the applicants." Similarly, in the present case, Barnett Bank's commitment to pay upon the presentation of *all* of the required documents by the (purported) seller lies at the heart of the Court's conclusion that the sight draft is to be construed in conjunction with the supporting documents.

Construing all of the documents in a transaction collectively is hardly novel, despite CNA's characterization of it as such. After all, it is a long-standing principle of contract interpretation that in determining the parties' intent, all writings that are part of the same transaction should be interpreted together. *See Goeke v. Merchants Nat'l Bank & Trust Co.*, 467 N.E.2d 760 (Ind.Ct.App. 1984); *Restatement (Second) of Contracts* § 202(2) cmts. a, d (1981).

Moreover, in *Community State Bank of Galva v. Hartford Ins. Co.*, 187 Ill.App.3d 110, 134 Ill.Dec. 810, 542 N.E.2d 1317 (1989), the court viewed as a single instrument all of the documents on which a bank relied in extending credit. There, a man ("Everett") delivered to the bank a forged power of attorney purportedly issued by a bank cus-

---

**6.** Thus, contrary to CNA's view, Omnisource does not carry a burden to show how the U.C.C. definitions are at variance with the plain and ordinary meaning of the terms of the policy. Moreover, CNA itself argues that "[c]ourts are not free to ignore the plain wording of an insurance contract." (Resp.Br. at 8 (citing *USA Life One Ins. v. Nuckolls*, 663 N.E.2d 541 (Ind.Ct. App.1996), *trans. denied*, Oct. 24, 1996)).

tomer appointing Everett as his agent. *Id.* at 811, 542 N.E.2d at 1318. Everett also delivered a promissory note executed by him as the agent for the bank customer, in consideration for which the bank paid $30,000 to him. *Id.* It was undisputed that the bank relied on the forged power of attorney in lending the money to Everett. *Id.* Unfortunately for the bank, however, its insurance policy covered losses resulting directly from forged promissory notes but not from forged powers of attorney. *Id.* at 812, 542 N.E.2d at 1319. The insurance company therefore urged that the policy did not cover this situation because the bank had relied solely on the forged power of attorney. *Id.* The court agreed that had the bank solely relied on a non-covered instrument, coverage would not apply. *Id.* at 813, 542 N.E.2d at 1320. However, because Everett had been required to execute the promissory note (a covered instrument), in order to be extended credit, "it [was] simply unreasonable to not take the forged note into consideration as well as the power of attorney." *Id.* The court reached this conclusion even though the bank had alleged in its complaint that it had relied solely on the power of attorney in extending credit to Everett.

Construction of the documents as a single instrument is even more compelling in the present case. Whereas the *Galva* bank had originally contended that it relied solely on the power of attorney, Omnisource has never contended that Barnett Bank relied solely on the sight draft in tendering its face value. Under the terms of the letter of credit, Barnett Bank could not pay unless each supporting document was presented. Thus, the sight draft without the required supporting documents would have been meaningless. Although CNA attempts to distinguish this case, arguing that the *Galva* court reasoned that the promissory note standing alone triggered coverage, Omnisource correctly observes that this contention overlooks the fact that the court stated that both the power of attorney and the promissory note were to be construed as a single instrument. *See id.*

Here, requiring that the supporting documents accompany the sight draft simply protected Omnisource's interest as a buyer in the underlying contract (in that the bill of lading purportedly assured that the goods were *en route*). CNA points to no rational reason why this transaction calls for the documents to be viewed separately. Rather, because the sight draft would have been useless without the supporting documents, the letter of credit transaction supports "bundling" these documents to construe them as a whole. The Court now turns, therefore, to the next challenge raised by CNA to whether the documents in question constituted a covered instrument.

### b. The phrase "drawn upon you" is ambiguous.

Conceding that the sight draft is a "[c]heck[ ], draft[ ], promissory note[ ], or similar written promise[ ], order[ ], or direction[ ] to pay a sum certain in 'money,' " CNA nonetheless posits that it is not a covered instrument because it was not "drawn upon" Omnisource. Following the statutory definition of "drawee" as one who is ordered in a draft to make payment, CNA maintains that Barnett Bank is the drawee in this transaction because it was named on the face of the draft.

Omnisource, however, denies that the Court must apply the statutory meaning of "drawee," especially since the contract does not call for its statutory definition. It challenges CNA's interpretation as "cramped" and nonsensical in that it leads to this result: had Omnisource been the victim of forgery where it paid by check, it would have insurance coverage, but where it chose as its payment scheme either a letter of credit or a certified check,[7] it would not be covered. Citing the definition of "draw" as "to get or receive from some source," Omnisource contends that it was the "drawee" since it was the "source" of the money (in substance if not technically). Omnisource Resp.Br. at 19 (quoting *Webster's New Universal Unabridged Dictionary* 553 (2d ed. 1983).

---

**7.** As with the sight draft in this letter of credit transaction, in the context of a certified check, the bank accepts the obligation to pay the face amount to the payee. *See* White & Summers, *supra,* § 16–6 at 88–89.

■ The coverage provision is ambiguous if it is "susceptible to more than one interpretation and reasonably intelligent men would differ as to its meaning." *Transcontinental Technical Servs.*, 642 N.E.2d at 983 (quoting *Harden,* 626 N.E.2d at 817). In determining the meaning of a term, a court is entitled to consult both *Black's Law Dictionary* and English dictionaries. *Kiger,* 662 N.E.2d at 948 n. 2; *see Marlatt v. United Farm Bureau Family Life Ins. Co.,* 640 N.E.2d 1073, 1077 (Ind.Ct.App.1994); *Mikel v. American Ambassador Cas. Co.,* 644 N.E.2d 168, 170 (Ind.Ct.App.1994), *trans. denied,* 652 N.E.2d 503 (1995).

Of course, simply asserting that dictionaries offer dueling definitions without considering the context in which the phrase is used risks leading to a "semantic ambiguity." *See 100 Center Dev. Co. v. Hacienda Mexican Rest., Inc.,* 546 N.E.2d 1256, 1258 n. 1 (Ind. Ct.App.1990) (citing Dickerson, *The Diseases of Legislative Language,* 1 Harvard Journal on Legislation 5 (1964), *reprinted in* Dickerson, *Materials on Legal Drafting* 55 (1981)); *see also Cincinnati Ins.,* 40 F.3d at 152 (citing cases). Here, however, the Court will undertake to carefully consider the factual context in which the phrase "drawn upon you" is used rather than mechanically apply dictionary definitions.[8]

On this record, the phrase "draw upon" is susceptible to at least two interpretations. "Draw" is defined as, *inter alia,* "[t]he act of a drawer in creating a draft. To draw a bill of exchange, check, or draft, is to write (or cause it to be written) and sign it; to make, as a note." *Black's Law Dictionary* (6th ed. 1996). The term also, however, means the following: "[t]o withdraw money; i.e., to take out money from a bank, treasury, or other depository in the exercise of a lawful right and in a lawful manner" *id.;* "[t]o use or call

upon part of a fund or store. Used with 'on' or 'upon,' " *American Heritage Dictionary of the English Language* 397 (Family ed. 1979) (*see, e.g., E.I. du Pont de Nemours and Co. v. State,* 283 N.J.Super. 331, 661 A.2d 1314, 1330 (App.Div.1995); and, "to get or receive from some source," *Webster's New Universal Unabridged Dictionary* 553 (2d ed. 1983)).

CNA argues that Barnett Bank is unambiguously the drawee in this case in the sense of being the entity named on the face of the draft, which it was legally obliged to pay. CNA emphasizes the "principle of independence"[9] in a letter of credit transaction to argue that the only reasonable interpretation of this language is that Barnett Bank, being legally required to honor the sight draft, is the drawee. Thus, under this view, because the bank, and not Omnisource, is the drawee, coverage is not mandated. However, that Omnisource and CNA intended this meaning seems unlikely given that CNA offers no rational reason why coverage is excluded where Omnisource chooses to pay by letter of credit (or, for that matter, by certified check, *see* note 7, *supra* ), which has been described as an ancient means of payment that may even pre-date the Middle Ages. *See* Dolan, *supra,* § 1.01 at 1–2. This view leads to a nonsensical result that could hardly have been intended. *See Conrad,* 670 N.E.2d at 937; *Technical Aid Corp. v. Allen,* 134 N.H. 1, 591 A.2d 262, 268 (1991); *Labracio v. Northern Ins. Co. of N.Y.,* 66 N.J.Super. 216, 168 A.2d 682 (Law Div.1961).

■ Moreover, such an intention could easily have been expressed but, inexplicably, was not. *See Northwest Agricultural Coop. Ass'n v. Continental Ins. Co.,* 95 Or.App. 285, 769 P.2d 218, 220 (1989) (reasoning that if an insurance company intended to exclude a certain situation from coverage, "it could have

---

8. To a certain extent, the Court is forced to rely on dictionary definitions given the dearth of case law addressing the meaning of this phrase in an insurance policy context.

9. This letter of credit payment mechanism is:
 often employed in international sales of goods because the letter of credit contract is independent of the underlying contract.... Under a letter of credit, the issuing bank must pay drafts or demands for payment which comply

with the terms of the credit, regardless of any breach of the underlying contract between the customer and the beneficiary.... In keeping with the goal of facilitating international trade, this principle of independence assures the beneficiary of prompt payment from a solvent party and minimizes the risk of judicial interference and litigation in a foreign jurisdiction. *All Season Ind. v. Tresfjord Boats A/S,* 563 N.E.2d 174, 177 (Ind.Ct.App.1990) (citations omitted).

done so easily" and refusing to add exclusionary language that the insurance company "could have, but did not, put in the policy"). But even assuming that CNA's proposed construction is reasonable, there is another reasonable construction that cuts in favor of insurance coverage. Given the choice between two reasonable interpretations, the Court chooses the construction that favors the insured. *Sutton*, 669 N.E.2d at 1021.

"[D]rawn upon" is not necessarily as limited, in this context, as CNA would have the Court decide. Barnett Bank would not have been obliged to honor the sight draft without an underlying contract between Metales and Omnisource (and, indeed, the bank had a right of reimbursement from Omnisource once it honored the sight draft, *see* White & Summers, *supra*, § 26–13 at 202). Thus, the bank can be seen as a mere conduit to propel the underlying transaction forward. This language could reasonably be interpreted as conveying that the bank was simply the holder of Omnisource funds from which the sight draft was honored. In the sense of "to draw" as to withdraw, to call on funds, or to get from a source, *see supra*, Omnisource can reasonably be viewed as the real (if not technical) source of the funds out of which the sight draft was honored. After all, in the final analysis, it was Omnisource that suffered the withdrawal and the loss; this circumstance also explains Omnisource's interest in, and expectation of, insurance coverage.

Moreover, this view comports with the rationale underlying letters of credit in the context of an international sale. *See generally* White & Summers, *supra*, § 26–1 at 106–08. In this setting, the letter of credit facilitates trade by allowing both the buyer and the seller to rely on the good faith of the bank (in honoring the sight draft) and the carrier (in issuing a bill of lading), rather than on each other. *See Republic Nat'l Bank v. Fidelity & Deposit Co.*, 894 F.2d 1255, 1258 (11th Cir.1990). The bank, under this reasonable interpretation, stands as a vehicle for carrying out the substantive transaction between the buyer and seller, and the buyer is actually the source of the funds from which the bank honors the sight

draft. *See* Peter H. Weil & Edwin E. Smith, *Letters of Credit*, 739 PLI/Comm 487, 495 (April 22–23, 1996) (referring to the commercial letter of credit as a "conduit for payment"). Because this second view of "draw" allows coverage where Omnisource chooses to pay via letter of credit (whereas the first definition inexplicably and arbitrarily excludes this payment mechanism), it is more likely that the parties intended this meaning.

At any rate, at least two reasonable interpretations of the provision exist. Thus, the Court must strictly construe the policy against the insurer. The Court now turns to CNA's argument that the forgery in the supporting documents was not a "covered cause of loss."

### 2. Whether the Forgery in the Supporting Documents was a "Covered Cause of Loss."

Here, the parties contest whether the transaction involved "[f]orgery or the alteration of, on or in any Covered Instrument." CNA asserts that the only covered instrument is the sight draft, and the record does not support a finding that it contained a forgery (although it concedes that the supporting documents were forged). Omnisource, in turn, bundles the supporting documents with the sight draft in order to assert that the admitted forgery in the supporting documents caused the loss.

This argument simply rephrases CNA's challenge to whether the draft and supporting documents constitute a covered instrument. As discussed *supra* in regard to that issue, because Barnett Bank perforce relied on the concededly forged supporting documents in honoring the sight draft, all of these documents can be interpreted as a "single instrument." Thus, the transaction involved forgery of a covered instrument.

Finally, the Court examines the last issue—causation.

### 3. Whether the Loss Resulted "Directly From" the Forgery.

CNA contends that Omnisource's loss did not directly result from the forgery but arose from the underlying contract, which is

completely independent of the letter of credit transaction. In response, Omnisource contends that its loss was proximately caused by reliance on the misrepresentations (in addition to the factual deceit). It maintains that but for the forgeries, the sight draft would never have been paid and it would have suffered no loss.

"Resulting directly from" language in an insurance contract has been construed to require proximate (i.e., legally responsible) cause. *Jefferson Bank v. Progressive Cas. Ins. Co.*, 965 F.2d 1274, 1281 (3d Cir.1991); *F.D.I.C. v. Reliance Ins. Corp.*, 716 F.Supp. 1001, 1004 (E.D.Ky.1989); *see* Dan B. Dobbs et al., *Prosser and Keaton on Torts: Hornbook Series* § 42 at 272–73 (Lawyers' ed. 1984). Proximate cause requires, at a minimum, factual causation. *Johnson v. Owens*, 639 N.E.2d 1016, 1023 (Ind.Ct.App.1994), *trans. denied*, Dec. 16, 1994. Here, of course, that condition is fulfilled because Omnisource's loss would not have occurred but for the existence of the underlying contract. It cannot seriously be contended, however, that the underlying contract *proximately* caused the loss. Indiana negligence law, for example, assigns legal responsibility for an injury to a negligent actor if it is a "natural and probable consequence which should have been foreseen." *Id.* Here, the loss was clearly a consequence of the forgery, and not of the underlying contract. Although proximate cause is generally an issue left to the trier of fact, *F.D.I.C.*, 716 F.Supp. at 1004, here, the undisputed facts and the conceded forgeries in the supporting documents allow the Court to conclude as a matter of law that the forgeries proximately caused the loss. Therefore, Omnisource's loss arose directly from a covered cause of loss. As a result, the Court rejects CNA challenge to coverage on this basis.

Having concluded that the relevant policy language is ambiguous at best on this record, the Court must strictly construe it against the insurer. Thus, Omnisource is entitled to coverage under the policy.

**10.** Beyond the apparently undisputed $261,-160.20 loss sustained by Omnisource, there remains a claim for interest, attorney fees and costs. *See* Omnisource Compl. at 5. The parties

## V. CONCLUSION

For the foregoing reasons, Omnisource's motion for summary judgment is GRANTED and CNA's motion is DENIED. The Court hereby declares that the subject policy of insurance provides coverage for Omnisource's loss arising out of its purchase of copper from Metales.[10]

have not briefed, nor submitted evidence on these points, and those issues are now set for a hearing on December 9, 1996, at 9:00 a.m.